Ehmann v. Medflow, Inc., 2020 NCBC 30.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

EUGENE K. EHMANN;
N. WILLIAM SCHIFFLI, JR.; and
THAD A. THRONEBURG,

        Plaintiffs,

        v.

MEDFLOW, INC.; GREG E.
LINDBERG; ELI RESEARCH, LLC;
ELI GLOBAL, LLC; ELI EQUITY, LLC;
SNA CAPITAL, LLC; SOUTHLAND
NATIONAL HOLDINGS, LLC;
SOUTHLAND NATIONAL
INSURANCE CORPORATION;
DJRTC, LLC; and MEDFLOW
HOLDINGS, LLC,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 3098

**JUDGMENT ON JURY VERDICT,
ORDER AND OPINION ON POST-
TRIAL MOTIONS, AND ORDER
AND OPINION ON PARTIAL
SUMMARY JUDGMENT MOTION**

1.      THIS MATTER arises from the circumstances surrounding the end of the employment relationship between Plaintiffs and their former employer, Defendant Medflow, Inc. ("Medflow"), and focuses in particular on the manner in which Plaintiffs' employment ended and Plaintiffs' rights to certain benefits under their employment contracts.

2.      Now before the Court are multiple motions, detailed below, including post-trial motions following a trial solely against Medflow on a limited issue regarding the enforceability of Plaintiffs' contracts, as well as a renewed summary judgment motion of which the Court deferred full consideration until after the trial.

3. Pursuant to an order in a rehabilitation proceeding in Wake County Superior Court in which Defendant Southland National Insurance Corporation ("SNIC") is also a party (the "Rehabilitation Proceeding"), this Court is enjoined from entering any judgment against SNIC or its assets without the express allowance of the Wake County Superior Court. In this Judgment, Order and Opinion, the Court makes no findings and expresses no opinion as to any right Plaintiffs may have to impose liability upon SNIC.

4. For the reasons stated below, the various motions are DENIED in part and GRANTED in part.

*Caudle & Spears, P.A., by Harold C. Spears and Christopher P. Raab, for Plaintiffs.*

*Condon Tobin Sladek Thornton PLLC, by Aaron Z. Tobin, Michele Spillman (pro hac vice), and Jared T.S. Pace (pro hac vice), and Fox Rothschild LLP, by Matthew Nis Leerberg and Troy D. Shelton, for Defendants Medflow, Inc. and Medflow Holdings, LLC.*

Gale, Judge.

## I. INTRODUCTION

5. Plaintiffs executed employment contracts with Medflow on or about July 5, 2014, which vary as to their effective dates and the amount of annual compensation, but otherwise contain the same terms on all matters central to this litigation. Plaintiffs bring this litigation, in part, to recover unpaid wages, change-of-control payments, and severance benefits to which they allege they are entitled under their agreements.

6. Throughout the course of this litigation, Medflow has maintained that the agreements are altogether unenforceable because they contain terms grossly

unfair to Medflow and were negotiated to protect Plaintiffs' personal interests in contravention of Plaintiffs' fiduciary duties to Medflow. It is uncontested that Plaintiffs Eugene K. Ehmann ("Ehmann") and Thad A. Throneburg ("Throneburg") owed fiduciary duties to Medflow at the time they entered their employment agreements as appointed officers. While Plaintiff N. William Schiffli, Jr. ("Schiffli") was an appointed Medflow officer at one time, he was not one when he entered his employment agreement and instead continued in his role as Medflow's Chief Financial Officer ("CFO") as an independent contractor. Medflow contends that Schiffli was nevertheless a *de facto* officer charged with the same fiduciary duties as Ehmann and Throneburg.

7. Fiduciary duties aside, Medflow contends in any event that Plaintiffs are not entitled to the benefits they seek under their employment agreements because it terminated each of those agreements for cause. Medflow argues it was not required to meet the contractual standard of termination for "Cause" because that standard is unconscionable. Plaintiffs contend the contractual definition of "Cause" applies, that Medflow could not demonstrate such Cause, and instead that they terminated the agreements for "Good Reason," entitling them to their change-of-control payments and severance benefits.

8. In 2016, all parties moved for summary judgment on the enforceability of Plaintiffs' contracts, focusing in particular on whether those transactions were protected by the business judgment rule, and if not, what standard should be applied to determine the fairness of those agreements. In its order and opinion denying the

summary judgment motions, the Court held Plaintiffs' employment agreements were interested transactions to the extent each Plaintiff was an officer and fiduciary of Medflow, imposing a duty on the officer to prove his agreement was fair to Medflow when entered. Because of the dispute about his status as a *de facto* officer, it was unresolved whether Schiffli should be required to shoulder that burden.

9. The Court then severed for early trial the issue of whether any plaintiff charged with fiduciary duties to Medflow could prove that his employment agreement was fair to Medflow when entered (the "Severed Issue"), limited further pre-trial discovery to the Severed Issue, and deferred its consideration of other pending motions including whether any other Defendants could be charged with any liability adjudged against Medflow.[1] First, a jury would determine if Schiffli was a *de facto* officer. Second, that jury would determine whether the employment agreement of each officer was fair to Medflow when entered.

10. The Severed Issue went to trial on April 22, 2019 ("Severed Issue Trial").

11. The jury concluded its deliberations on May 13, 2019. The jurors issued a unanimous verdict that Schiffli was not a *de facto* officer at the time he executed his employment agreement and, as a result, did not consider the fairness of his agreement to Medflow when entered. The jury was unable to reach a unanimous

---

[1] Medflow is the corporate party to the employment agreements at issue. Defendant Medflow Holdings, LLC ("Holdings") was formed after the employment agreements were executed but has stipulated for purposes of this case that it is Medflow's corporate successor, which can be charged for any liability that might arise against Medflow under the employment agreements.

verdict on whether Ehmann and Throneburg's employment agreements were fair to Medflow when entered.

12. The Court must now resolve the following post-trial motions: (1) Ehmann and Throneburg's motion for judgment notwithstanding the verdict, (2) Medflow's motion for judgment notwithstanding the verdict or (3) new trial with respect to Ehmann and Throneburg, (4) Medflow's motion for judgment notwithstanding the verdict or (5) new trial as to Schiffli, and (6) Schiffli's motion for entry of judgment and (7) renewed motion for partial summary judgment (together, the "Motions").

## II.    FACTUAL BACKGROUND[2]

13. Medflow is or was a provider of computer software for the medical industry.[3] James Riggi ("Riggi") founded Medflow and was its Chief Executive Officer ("CEO") or president until December 2013. (Aff. D. James Riggi ¶¶ 3–4 ("Riggi Aff."), ECF No. 192.)[4] Prior to December 2014, Riggi and DavLong Business Solutions, LLC ("DavLong") controlled by David Long ("Long"), owned the controlling interest in

---

[2] For more factual background and greater detail regarding the procedural history preceding the current Motions, *see Ehmann v. Medflow, Inc.*, 2019 NCBC LEXIS 10, at *1–8 (N.C. Super. Ct. Feb. 6, 2019); *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *1–25 (N.C. Super. Ct. Sept. 26, 2017).

[3] Medflow is inactive. Its liabilities, other than those which might be owed to Plaintiffs, and assets, were acquired by Holdings. Defendants have stipulated that Holdings is the successor-in-interest to Medflow, liable for any obligation Medflow owes to Plaintiffs, and the corporate Defendants continue to operate Medflow's prior business of providing software to the medical industry. The parties continue to dispute whether Medflow's liabilities, if any, may be imposed on any Defendant other than Holdings.

[4] For convenience, the Court will at times cite to affidavits filed by the parties, most often to refer to facts that have not been disputed. The affiants testified at trial consistently with the affidavit testimony cited.

Medflow, which had other minority shareholders. (Riggi Aff. ¶ 6; Aff. David Long ¶ 5, ECF No. 194.)

14. Ehmann and Throneburg became Medflow shareholders in 2004. (Aff. Thad A. Throneburg ¶ 26 ("Throneburg Aff."), ECF No. 171.16; Eugene K. Ehmann Aff. ¶ 10 ("Ehmann Aff."), ECF No. 176.) Throneburg, a North Carolina attorney, served as Medflow's CEO from January 1, 2005 to November 2007 when he sold his approximate 24% ownership interest to DavLong and returned to active law practice. (Throneburg Aff. ¶¶ 27, 38, 42.)

15. Following Throneburg's departure, Riggi again became CEO. (Ehmann Aff. ¶ 15.) In November 2009, Ehmann accepted a position as Medflow's director of human resources but was not appointed an officer at that time. (Ehmann Aff. ¶ 18.) In June 2010, Schiffli joined Medflow as its CFO pursuant to an independent contractor arrangement and served as an appointed Medflow officer prior to December 2013. (Aff. N. William Schiffli, Jr. ¶ 2, ECF No. 13; *see also* Throneburg Aff. ¶ 107.)

16. On December 10, 2013, catalyzed by growing dissatisfaction with Riggi's leadership, (*see* Ehmann Aff. ¶ 24), Medflow shareholders met and took several actions. All existing Medflow officers including Schiffli were removed from their roles as officers. Riggi was ousted from management and Throneburg was hired as interim CEO on a short-term contract. The Board of Directors was reorganized and limited to one member. Ehmann was elected as Vice President, Treasurer, and Secretary,

and was appointed as Medflow's sole director.  (Ehmann Aff. ¶ 39; Throneburg Aff. Ex. 3, at 2 ("Dec. 10, 2013 Shareholder Meeting Mins."), ECF No. 171.4.)

17.     Although Schiffli was terminated as an officer in December 2013, he continued to maintain the title of Medflow's CFO.  (*See* Throneburg Aff. ¶ 55; *see also* Dec. 10, 2013 Shareholder Meeting Mins. 3.)  Ehmann testified that Schiffli's officer status was revoked upon Riggi's ouster because of concern over Schiffli's potential loyalty to Riggi.  (Civil Trial Tr. Vol. VI of XII Mon., Apr. 29, 2019 72:12–73:3 ("Trial Tr. Vol. VI"), ECF No. 374.4.)  Ehmann eventually reappointed Schiffli as a *de jure* officer in December 2014.  (Second Am. Compl. Ex. 9, at 1 ("Dec. 9, 2014 Director Action"), ECF No. 118.1.)  Schiffli therefore negotiated and executed his employment agreement during the interim period in which he was not an appointed Medflow officer.

18.     Throneburg testified that, when he returned as Medflow's CEO, he initially prioritized the formation of a senior management team including James Messier ("Messier"),[5] Ehmann, Schiffli, and himself.  (Civil Trial Tr. Vol. VII of XII Tue., Apr. 30, 2019 192:19−194:13, ECF No. 374.5; *see also* Throneburg Aff. ¶¶ 68−69.)  Plaintiffs testified that the senior management team adopted a three-year strategic plan in early 2014 that focused on moving Medflow's software platform from a server-based system to a cloud-based system and that Throneburg deemed it critical

---

[5] Messier is not a party to this litigation.  He entered a Medflow employment agreement at the same time as Plaintiffs containing similar terms.  Unlike Plaintiffs, Medflow did not terminate his employment and he continues to work for Medflow's successor under a different agreement.  (Civil Trial Tr. Vol. IX of XII Thu., May 2, 2019 200:14–204:6 ("Trial Tr. Vol. IX"), ECF No. 374.7.)  He testified on behalf of Medflow at the Severed Issue Trial.

to extend multi-year contracts to the senior management team—the persons necessary to effectuate this strategic plan. (Civil Trial Transcript Vol. VIII of XII Wed., May 1, 2019 25:24−26:18 ("Trial Tr. Vol. VIII"), ECF No. 374.6; *see also* Ehmann Aff. ¶¶ 44−45; Throneburg Aff. ¶¶ 75−76.)

19.     Medflow's bylaws provide that compensation for officers is to be determined by its directors, while making no similar provision for the compensation of other employees. (Throneburg Aff. Ex. 2, at 6 ("Medflow Bylaws"), ECF No. 171.7.) Ehmann first orally agreed to the terms of an employment agreement with Throneburg and later requested that Throneburg reduce those terms to writing. (Trial Tr. Vol. IX 13:13−16.) After reaching this oral agreement, Ehmann accepted Throneburg's advice that he could delegate to Throneburg the board's authority to determine compensation for officers. Throneburg represented Medflow in negotiating the employment agreements for Ehmann, Messier, and Schiffli between March and July 2014, and drafted the agreements for himself and the others on July 5−7, 2014, with effective dates retroactive to the day on which each person orally agreed to the chief terms of their employment. (Trial Tr. Vol. VIII 40:21−24, 43:15−17, 57:25−58:5, 66:3−6, 87:10−12, 101:1−103:2.)

20.     Plaintiffs' employment agreements contain identical terms except for the effective date, compensation amount, and description of job duties. (*Compare* Throneburg Agreement, ECF No. 118.2, *with* Ehmann Agreement, ECF No. 118.34, *and* Pl. Ex. 005 ("Schiffli Agreement"), ECF No. 342 (together, "Pls.' Agreements").)

21. Each agreement provides for "Severance Benefits" if Medflow terminated it without Cause or a Plaintiff terminated it for Good Reason. Severance Benefits include a payment equal to the Plaintiff's annual base salary ("Severance Payment"), (Pls.' Agreements ¶ 9(a)(i)), and thirty-six consecutive months of "hospital, medical, dental, accident, disability and life insurance coverage equivalent to that provided to Medflow employees" immediately following termination ("Insurance Benefits"), (Pls.' Agreements ¶ 9(a)(ii)). The agreements also provide for a "Change-of-Control Payment" equal to one year of annual salary plus a "Gross-up" which is determined by a calculation set out in the agreements.[6] (Pls.' Agreements ¶ 17.) Finally, the agreements provide that each party to the agreement would indemnify the other "against all costs incurred by it in connection with its attempts to seek damages or other remedies available to it as a result of the defaulting party's breach[.]" (Pls.' Agreements ¶ 23.)

22. While Medflow had outside counsel that it consulted on various matters, neither Ehmann nor Throneburg asked for advice from outside counsel before executing their agreements, relying instead on Throneburg's experience and expertise. (Trial Tr. Vol. IX 14:12–17, 17:10–14, 17:24–18:9, 101:18–25.) Furthermore, Ehmann and Throneburg did not seek independent review and approval of the Plaintiffs' employment agreements by Medflow's shareholders. (Trial

---

[6] As late as July 5, 2014, Plaintiffs' agreements included a Severance Payment term equal to two years of annual salary instead of a change-of-control bonus. Throneburg testified that he modified all three agreements after considering Schiffli's request for such a bonus, such that the final agreements provided for one year of severance in addition to a change-of-control bonus. (Trial Tr. Vol. VIII 74:15–16, 101:1–103:2.)

Tr. Vol. IX 156:5−7); *see Ehmann*, 2017 NCBC LEXIS 88, at \*51 ("It is undisputed that the shareholders were not asked to approve the employment agreements.").

23.     In the latter half of 2014, Defendant Greg E. Lindberg ("Lindberg") first acquired beneficial ownership of Riggi's shares and then acquired control over DavLong's holdings, which vested him with controlling authority of Medflow. (Second Am. Compl. ¶¶ 29−34 ("V. 2nd Am. Compl."), ECF No. 119.6.) On December 19, 2014, Lindberg attended Medflow's annual shareholders meeting at which he was elected Medflow's sole director. (V. 2nd Am. Compl. ¶ 302.) By January 16, 2015, Lindberg had acquired ownership of all Medflow shares through his company Defendant Eli Global, LLC ("Eli Global").[7] (V. 2nd Am. Compl. ¶ 325.) Lindberg and his companies conducted very limited due diligence before completing their acquisition of Medflow.

24.     On January 22, 2015, Eli Global representatives visited Medflow's offices, at which time Schiffli provided them with copies of Plaintiffs' employment agreements and calculations for the amount of Plaintiffs' Change-of-Control

---

[7] While the exact relationship between Medflow and Lindberg's companies, including any inter-company transfers, have not yet been fully discovered or resolved, there is no dispute that either Lindberg or companies he controls acquired all Medflow shares. Although discovery as to this issue has not been concluded, the record suggests that funds for the acquisition may have been acquired through an intra-corporate loan or series of loans through which SNIC acquired a senior lien on all of Medflow assets. Plaintiffs contend that they should have a senior lien position because of the security interests provided by their employment agreements and because Plaintiffs deferred perfecting their interests only because they relied on Lindberg's alleged false assurances that Medflow intended to honor their employment agreements and make the Change-of-Control Payments. (V. 2nd Am. Compl. ¶¶ 248, 359, 368−370.) In a pending motion for prejudgment relief that is not the subject of this Judgment, Order, and Opinion, Plaintiffs contend that the assets taken from Medflow following its acquisition by Lindberg's companies should be restored, at least to the extent of Medflow's alleged liabilities to Plaintiffs. The validity, priority, and effect of any such claimed liens involves issues before the Wake County Superior Court in the Rehabilitation Proceeding, and this Court does not consider those issues at present in light of the injunction entered in that action.

Payments. (V. 2nd Am. Compl. ¶¶ 347–48.) This constituted Lindberg and Eli Global's first knowledge of Plaintiffs' agreements and their terms.

25. In February 2015, Plaintiffs were placed on administrative leave. Plaintiffs initiated this litigation shortly thereafter on February 18, 2015. (*See* Compl., ECF No. 1.) Medflow delivered letters to Plaintiffs on May 1, 2015 stating that they were being terminated for Cause, effective immediately. Plaintiffs deny that Medflow had the Cause the agreements require, but in part because Medflow stripped Plaintiffs of their duties, Plaintiffs contend they appropriately terminated their agreements for Good Reason by written notice to Medflow in Fall 2015. The agreements provide for Severance Benefits only if Medflow terminated without Cause or if Plaintiffs terminate for Good Reason.

### III.  PROCEDURAL HISTORY[8]

26. Plaintiffs filed their verified second amended complaint ("Second Amended Complaint") on December 2, 2015, alleging twelve causes of action styled: (1) breach of contract, (2) violation of the North Carolina Wage and Hour Act ("Wage and Hour Act"), (3) violation of the North Carolina Retaliatory Employment Discrimination Act, (4) tortious retaliation, (5) fraudulent transfer, (6) fraud, (7) violation of the Unfair and Deceptive Trade Practices Act, (8) successor liability, (9) alter ego/piercing the corporate veil, (10) conspiracy in the alternative, (11) Southland

---

[8] The Court recites only the procedural history relevant to the Motions now before the Court and refers the reader to prior opinions in this litigation for further procedural details.

Insurance security interest constructive trust in the alternative, and (12) replevin or in the alternative, conversion. (V. 2nd Am. Compl.)

27. On December 4, 2015, Defendants moved to dismiss Plaintiffs' Second Amended Complaint in its entirety (the "Motion to Dismiss"). (Defs.' Mot. Dismiss, ECF No. 120.)

28. Plaintiffs then filed separate, partial motions for summary judgment on their breach of contract claims. Schiffli moved for partial summary judgment on April 1, 2016 ("Schiffli's 2016 Summary Judgment Motion"), (Pl. Schiffli's Mot. Partial Summ. J., ECF No. 159), Throneburg moved on July 18, 2016, (Pl. Throneburg's Mot. Partial Summ. J., ECF 171.17), and Ehmann moved on August 11, 2016, (Pl. Ehmann's Mot. Partial Summ. J., ECF No. 176.1).

29. On September 13, 2016, the Court denied the Motion to Dismiss as to the breach of contract claims brought against Medflow and Holdings (together "Medflow Defendants"). (Order Defs.' Mot. Dismiss ¶ 1, ECF No. 182.) The Court deferred ruling on the Motion to Dismiss as to the other Defendants and claims and ordered Medflow Defendants to plead in their answer "all avoidances, affirmative defenses, and counterclaims that relate to or arise out of the transactions or occurrences that are the subject matter of Plaintiffs' breach-of-contract claims." (Order Defs.' Mot. Dismiss ¶¶ 3–4.)

30. On September 19, 2016, the Court then severed for early trial the Severed Issue, defined as whether "Plaintiffs' employment agreements are binding and enforceable, which includes whether the agreements were validly executed and

whether the agreements should . . . be voided because they are unfair to Medflow, Inc." (Order Regarding Scheduling & Severance Issue Trial ¶ 1, ECF No. 183.) The Court allowed additional discovery limited to the Severed Issue prior to a hearing on Plaintiffs' pending summary judgment motions and Defendants' anticipated motions for summary judgment. (Order Regarding Scheduling & Severance Issue Trial 3–4.)

31. On October 3, 2016, Medflow Defendants answered Plaintiffs' Second Amended Complaint and stated affirmative defenses and counterclaims related to Plaintiffs' breach of contract claims. (Medflow, Inc. & Medflow Holdings, LLC's Answer, Affirmative Defenses, & Countercl. Pls.' Second Am. Compl. ("Medflow Defs. Answer & Countercl."), ECF No. 189.)

32. These affirmative defenses included that the agreements were procured by fraud and breach of fiduciary duty, are unenforceable because they are procedurally and substantively unconscionable, are unfair, are barred by the doctrine of unclean hands, and that Ehmann released his claims in connection with the purchase of his shares by Lindberg or his entities. (*See* Medflow Defs. Answer & Countercl. 23.)

33. Medflow Defendants also stated counterclaims for breach of fiduciary duty, declaratory judgment as to the employment agreements and confidentiality agreements (for lack of mutual assent and consideration), declaratory judgment as to the security agreements (for lack of mutual assent and consideration), constructive fraud, civil conspiracy, unfair and deceptive trade practices in violation of N.C.G.S. §

75-1.1, conversion, and publication of personal information in violation of N.C.G.S. § 75-66. (Medflow Defs. Answer & Countercl. 36–45.)

34. On November 15, 2016, Defendants filed separate summary judgment motions against each Plaintiff. (*See* Defs.' Mot. Summ. J. Against Eugene K. Ehmann, ECF No. 200; Defs.' Mot. Summ. J. Against N. William Schiffli, Jr., ECF No. 203; Defs.' Mot. Summ. J. Against Thad A. Throneburg, ECF No. 205.)

35. On September 26, 2017, the Court denied the cross-motions for summary judgment. In its opinion, the Court set forth that Ehmann and Throneburg, and Schiffli if found to be an officer, must bear the burden of proving that their agreements were fair to Medflow when entered ("Summary Judgment Opinion"). *Ehmann*, 2017 NCBC LEXIS 88, at *58−59.

36. On October 26, 2017, Plaintiffs appealed three of the Court's orders to the Supreme Court of North Carolina: the Summary Judgment Opinion, Order Regarding Discovery for Trial on the Severed Issue, and Order Regarding Scheduling and Severance of Issue for Trial. (Notice Appeal, ECF No. 261.) Plaintiffs later sought a review of these orders via a Petition for Writ of Certiorari filed on January 31, 2018. (*See* Pls.' Mot. Stay Proceedings Pending Pet. Writ Cert., ECF No. 264.)

37. On August 14, 2018, the Supreme Court denied Plaintiffs' Petition for Writ of Certiorari and allowed Defendants' motion to dismiss the appeal. *See Ehmann v. Medflow, Inc.*, 371 N.C. 461, 817 S.E.2d 393 (2018); *Ehmann v. Medflow, Inc.*, 371 N.C. 461, 817 S.E.2d 206, 207 (2018).

38.     On November 8, 2018, Plaintiffs filed a motion for reconsideration of the Summary Judgment Opinion, (Pls.' Mot. Recons., ECF No. 275), which the Court denied on February 6, 2019, *Ehmann*, 2019 NCBC LEXIS 10, at *21.

39.     On March 6, 2019, the Court noticed the Severed Issue Trial, (Notice Trial & Pretrial Schedule, ECF No. 296), which began on April 22, 2019.

40.     Defendants raised a *Batson* challenge during *voir dire*, (*see* Civil Trial Tr. Vol. II of XII Tue., Apr. 23, 2019 63:14−18 ("Trial Tr. Vol. II"), ECF No. 374.2), which, after due consideration, the Court denied from the bench, (Trial Tr. Vol. II 95:10−96:8).

41.     The jury was impaneled on April 23, 2019, and counsel made their opening statements that day.  Following the close of all evidence, all parties timely moved for a directed verdict on all issues, (Civil Trial Tr. Vol. X of XII Tue., May 7, 2019 109:17–110:11, 110:20–113:15 ("Trial Tr. Vol. X"), ECF No. 374.8), which the Court denied, (Trial Tr. Vol. X 113:16–19).

42.     Counsel made closing arguments on May 8, 2019, after which the Court instructed the jury.  (Civil Trial Tr. Vol. XI of XII Wed., May 8, 2019 117:1−135:14 ("Trial Tr. Vol. XI"), ECF No. 374.9.)

43.     The Court submitted the following issues to the jury: (1) "[w]as Schiffli an officer of Medflow, Inc. at the time he entered his employment agreement with Medflow, Inc.?", (2) "[w]as the employment agreement between Medflow, Inc. and Schiffli fair to Medflow, Inc. at the time it was entered?", (3) "[w]as the employment agreement between Medflow, Inc. and Ehmann fair to Medflow, Inc. at the time it

was entered?", and (4) "[w]as the employment agreement between Medflow, Inc. and Throneburg fair to Medflow, Inc. at the time it was entered?"  (Verdict Sheet, ECF No. 330.)  The Court instructed that Medflow had the burden of proof on issue one, that the jury would reach issue two only if it answered issue one "yes", and that the burden of proof on issues two, three, and four was on each respective Plaintiff.

44.     The jury returned its verdict on May 13, 2019 and answered "no" to issue one, did not consider issue two, and advised that it was "unable to answer" issues three and four.  (Civil Trial Tr. Vol. XII of XII Mon., May 13, 2019 30:23−32:4 ("Trial Tr. Vol. XII"), ECF No. 374.10.)

45.     Following the Court's discharge of the jury, in open court Ehmann and Throneburg moved for judgment notwithstanding the verdict pursuant to Rule 50 of the North Carolina Rules of Civil Procedure ("Rule(s)"), (Trial Tr. Vol. XII 46:25–47:6), Schiffli requested entry of a judgment that he is entitled to recover under his contract, (Trial Tr. Vol. XII 50:15–19), and Defendants reserved the right to make post-trial motions, (Trial Tr. Vol. XII 49:3–7).

46.     On May 23, 2019, Medflow filed its: (1) motion for new trial against Schiffli pursuant to Rule 59(a), (2) motion for judgment as a matter of law against all Plaintiffs pursuant to Rule 50(b), and (3) alternatively, motion for new trial on all issues against all Plaintiffs.  (Defs. Mot. J., J. Notwithstanding Verdict, & New Trial ("Def.'s Mot. J., JNOV, & New Trial"), ECF No. 325.)

47.     On May 29, 2019, Schiffli filed a motion for entry of judgment on the jury verdict and renewed his 2016 Summary Judgment Motion on issues not

previously reached by the Court in its Summary Judgment Opinion. (Mot. Entry J. Jury Verdict & Summ. J. Mot., ECF No. 327.)

48. On June 7, 2019, Ehmann and Throneburg filed a motion for judgment notwithstanding the verdict. (Ehmann & Throneburg's Mot. J. Notwithstanding Verdict, ECF No. 333.)

49. On July 5, 2019, Plaintiffs notified the Court of the Wake County Rehabilitation Proceeding enjoining certain proceedings in this litigation. (Request Judicial Notice, ECF No. 350.)

50. The Court held a hearing on all pending Motions on July 17, 2019. The Court delayed its consideration of the Motions until the parties submitted a complete transcript of the Severed Issue Trial in September 2019. The Court further defers entry of any opinion on other pending motions, including those that may touch upon issues subject to the injunction issued in the Rehabilitation Proceeding.

51. All Motions have been fully briefed and argued and are now ripe for determination.

## IV. STANDARDS OF REVIEW

### A. <u>Judgment Notwithstanding the Verdict</u>

52. A motion for judgment notwithstanding the verdict ("JNOV") is a renewal of an earlier motion for directed verdict. *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 368–69, 329 S.E.2d 333, 337 (1985) (citation omitted). JNOV motions question "whether the evidence, taken in the light most favorable to the non-moving party, [wa]s sufficient as a matter of law to be submitted to the jury."

*Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 720, 693 S.E.2d 640, 643 (2009) (citation omitted).

53. "[A] motion for judgment notwithstanding the verdict is cautiously and sparingly granted." *Bryant*, 313 N.C. at 369, 329 S.E.2d at 338 (citation omitted). "To survive a motion for directed verdict or JNOV, the non-movant must present 'more than a scintilla of evidence' to support its claim." *Morris v. Scenera Research, LLC*, 368 N.C. 857, 861, 788 S.E.2d 154, 157 (2016) (citation omitted). "While a scintilla is very slight evidence, the non-movant's evidence must still do more than raise a suspicion, conjecture, guess, surmise, or speculation as to the pertinent facts in order to justify its submission to the jury." *Id.*, 788 S.E.2d at 158 (internal quotations and citations omitted). "[T]he party opposing the motion must provide actual proof[] 'of such a character as reasonabl[e] to warrant the inference of the fact required to be established[.]'" *Maurer v. SlickEdit, Inc.*, 2006 NCBC LEXIS 1, at \*25 (N.C. Super. Ct. Feb. 3, 2006) (quoting *Lee v. Stevens*, 251 N.C. 429, 433, 111 S.E.2d 623, 627 (1959)). "The trial court must construe the evidence in the light most favorable to the non-movant and resolve all evidentiary conflicts in the non-movant's favor." *Morris,* 368 N.C. at 861, 788 S.E.2d at 158 (citation omitted).

**B. New Trial**

54. "The power to grant a new trial is entrusted to the discretion of the trial court—discretion that 'must be used with *great care and exceeding reluctance.*'" *Shaw v. Gee*, 2018 NCBC LEXIS 109, at \*15 (N.C. Super. Ct. Oct. 19, 2018) (quoting *In re Will of Buck*, 350 N.C. 621, 626, 516 S.E.2d 858, 861 (1999)). The "verdict should

be liberally and favorably construed with a view of sustaining it, if possible," *Piazza v. Kirkbride*, 246 N.C. App. 576, 580, 785 S.E.2d 695, 698 (2016) (citation omitted), and though the grounds for granting a new trial are numerous, *see* N.C.G.S. § 1A-1, Rule 59(a), a jury verdict should be set aside only in "those exceptional situations where the verdict is contrary to the evidence presented and will result in a miscarriage of justice," *In re Will of Buck*, 350 N.C. at 628, 516 S.E.2d at 862.

### C. Summary Judgment

55. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact[,] and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). "Summary judgment is improper if any material fact is subject to dispute." *Culler v. Hamlett*, 148 N.C. App. 389, 391, 559 S.E.2d 192, 194 (2002) (quoting *Ragland v. Moore*, 299 N.C. 360, 363, 261 S.E.2d 666, 668 (1980)). "[A]n issue is genuine if it is supported by substantial evidence, which is that amount of relevant evidence necessary to persuade a reasonable mind to accept a conclusion." *Fox v. Green*, 161 N.C. App. 460, 464, 588 S.E.2d 899, 903 (2003) (quoting *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 124 (2002)).

56. The movant bears the burden of proving the lack of a triable issue. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). Once the movant has met that burden, the burden shifts to the non-moving party to produce a forecast of evidence that demonstrates facts showing that it can establish a prima

facie case at trial. *Austin Maint. & Constr., Inc. v. Crowder Constr. Co.*, 224 N.C. App. 401, 407, 742 S.E.2d 535, 540 (2012). The Court must view all the presented evidence in the light most favorable to the non-moving party. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 707.

## V.    ANALYSIS

### A.    Medflow's Motions for JNOV and New Trial as to Schiffli

#### (1)    JNOV Against Schiffli

57.    Medflow moves for JNOV on the issue of whether Schiffli was an officer at the time he entered his employment agreement based on its contention that the evidence presented at trial conclusively "showed that Schiffli held himself out as the Chief Financial Officer of Medflow and was viewed by others both inside and outside Medflow as the Chief Financial Officer." (Def.'s Mot. J., JNOV, & New Trial 3.)

58.    In support, Medflow cites that Schiffli is referred to as CFO in his employment agreement, signed e-mails and used business cards referring to himself as CFO, admitted that Medflow had no other CFO, prepared financial statements and business projections for Medflow, and continued to perform the same duties after he ceased to be a *de jure* officer. (Br. Supp. Def.'s Mot. J., J. Notwithstanding Verdict, & New Trial Against Schiffli, & Br. Opp'n Schiffli's Mot. Entry J. 3–4 ("Def.'s Br. Supp. Mot. J., JNOV, & New Trial Against Schiffli, & Br. Opp'n Schiffli's Mot. Entry J."), ECF No. 342.)

59.    Medflow has maintained that Schiffli's title alone was adequate to impose upon him the fiduciary duties of a *de facto* officer. Over Medflow's objection,

the Court instructed the jury that Schiffli merely holding the title of an office was insufficient to find in Medflow's favor. Instead, the Court instructed the jury that a "*de facto* officer is an officer by the nature and extent of duties undertaken on behalf of the corporation[,]" (Jury Instrs. 7, ECF No. 340), and is

> a person who is not an elected officer but acts with the level of authority and control that rises to the level of an officer[.] [A] person must appear to hold an actual office under some degree of notoriety, which means that the individual is generally known or spoken of as holding the office, or color of title, which means that the individual apparently holds title to the office. In addition, the individual must continuously exercise the functions of the office. The mere fact that an individual uses the title to the office is not alone sufficient. In addition to his title, the individual must have authority for tasks commensurate with those of an officer. For example, a *de facto* officer might have authority to sign tax returns, offer major input as to the company's formation and operation, manage the company, hire and fire employees, or make purchases on behalf of the company.

(Jury Instrs. 8); *see Havelock Yacht Club, Inc. v. Crystal Lake Yacht Club, Inc.*, 215 N.C. App. 153, 156, 714 S.E.2d 788, 790 (2011); *Kinesis Advert., Inc. v. Hill*, 187 N.C. App. 1, 15–16, 652 S.E.2d 284, 295 (2007).

60. At the Severed Issue Trial, Ehmann testified that, after Riggi was ousted and he appointed Throneburg as Medflow's CEO, he "made the conscious decision" not to reappoint Schiffli as an elected officer of Medflow. (Trial Tr. Vol. VI 72:12–16.) Ehmann continued:

> Bill [Schiffli] was Jim Riggi's right-hand man. Bill was very, very loyal to people. . . . [Y]ou heard me earlier say that I've been working with Bill for four years, but I didn't know Bill. And I didn't want to put the company at risk to put somebody in there that might have loyalty issues. . . . We had to take some of his responsibilities away because I just didn't know what he knew. I didn't know how he was going to react.

(Trial Tr. Vol. VI 72:15–73:3.)

61.     As a result, Schiffli had "little authority or control over matters of significance" directly after Throneburg took over management. (Mem. Opp'n Def.'s Mots. J., J. Notwithstanding Verdict, & New Trial Against Schiffli 3 ("Schiffli's Mem. Opp'n Defs.' Mot. J. JNOV, & New Trial"), ECF No. 344; *see* Civil Trial Tr. Vol. IV of XII Thur., April 25, 2019 131:15–132:14, 135:13–136:2, 136:12–139:20, 161:17–162:13, 163:8–165:4, 169:23–171:21 ("Trial Tr. Vol. IV"), ECF No. 361.) According to Schiffli, his duties were limited to overseeing the accounting team and bookkeepers, overseeing accounts receivable, doing financial analysis, gathering information, and developing business plans according to Throneburg's instructions. (Trial Tr. Vol. IV 172:25–173:6, 177:24–175:1, 179:7–9.)

62.     In sum, while there was evidence presented upon which the jury might have found in Medflow's favor, there was "more than a scintilla" of evidence in Schiffli's favor. *Maurer*, 2006 NCBC LEXIS 1, at *25 (quoting *Clark v. Moore*, 65 N.C. App. 609, 610, 309 S.E.2d 579, 580 (1983)). Medflow's Motion for JNOV should therefore be denied.[9]

### (2)     New Trial as to Schiffli

63.     Medflow moves for a new trial as to Schiffli on three alternative grounds: (1) because "Schiffli violated the equal protection clause of the United States

---

[9] Because the Court concludes that Defendants are not entitled to JNOV on the *de facto* officer issue, it need not address Medflow's additional argument that it is entitled to JNOV that Schiffli failed to carry his burden of proving the fairness of his employment agreement. (*See* Def.'s Br. Supp. Mot. J., JNOV, & New Trial Against Schiffli, & Br. Opp'n Schiffli's Mot. Entry J. 5.) As discussed below, the Court concludes that there is no other basis to impose on Schiffli the burden of proving the fairness of his agreement to Medflow at the time it was entered.

Constitution by exercising peremptory challenges based on prospective jurors' race,"

("Batson Challenge"); (2) "Schiffli's counsel's closing statement to the jury was replete

with prejudicial statements[,]" and (3) "the Court erred in its jury instructions

regarding the *de facto* officer issue[.]" (Def.'s Mot. J., JNOV, & New Trial 1–3.) The

Court concludes its jury instruction on the issue of whether Schiffli was a *de facto*

officer is consistent with North Carolina law as cited above, (*see supra* Section

V(A)(1)), and does not again address Medflow's challenge to that instruction on

Medflow's motion for new trial as to Schiffli.

### a.     Batson Challenge

64.     Medflow raised its Batson Challenge, *see generally Batson v. Kentucky*,

476 U.S. 79 (1986) (holding that litigants may not use peremptory challenges to

engage in purposeful racial discrimination in violation of the equal protection clause),

after Plaintiffs used four of their five peremptory strikes to excuse black jurors, (Def.'s

Mot. J., JNOV, & New Trial 1). The Court now reaffirms its oral ruling made at the

Severed Issue Trial denying the challenge and allowing jury selection to proceed.

65.     *Batson* challenges arise most often in criminal proceedings but are also

recognized in the civil context. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614,

631 (1991) (extending *Batson*'s burden-shifting framework to civil proceedings).

Courts use "[a] three-step process" to evaluate claims of racial discrimination in the

exercise of peremptory challenges:

> First, [the challenger] must establish a *prima facie* case[10] that the
> peremptory challenge was exercised on the basis of race. Second, if such

---

[10] Factors relevant to the *prima facie* case include:

a showing is made, the burden shifts to the [challengee] to offer a racially neutral explanation to rebut [the challenger]'s *prima facie* case. Third, the trial court must determine whether the [challenger] has proven purposeful discrimination.

*Id.* (quoting *State v. Cummings*, 346 N.C. 291, 307–08, 488 S.E.2d 550, 560 (1997)). Where a trial court solicits a showing of a race-neutral justification before ruling on whether the challenger first established a *prima facie* case of discrimination, the challenger is relieved of that initial burden. *Hernandez v. New York*, 500 U.S. 352, 359 (1991); *State v. Williams*, 343 N.C. 345, 359, 471 S.E.2d 379, 386 (1996).

66.     Here, Defendants raised the Batson Challenge, and the Court solicited a race-neutral justification for Plaintiffs' peremptory challenges before ruling on whether Defendants made a *prima facie* demonstration of racial prejudice.

67.     In response to the Batson Challenge, Plaintiffs asserted that they exercised their peremptory challenges based on the prospective jurors' lack of relevant education, (Trial Tr. Vol. II 64:17–65:18), and the extent to which they were familiar with the technology that, according to Plaintiffs' theory of the case, was key to the underlying facts and circumstances informing Plaintiffs' decisions and the

---

the victim's race, the race of the key witnesses, questions and statements of the [challengee] which tend to support or refute an inference of discrimination, repeated use of peremptory challenges against blacks such that it tends to establish a pattern of strikes against blacks in the venire, the [challengee]'s use of a disproportionate number of peremptory challenges to strike black jurors in a single case, and the [challengee]'s acceptance rate of potential black jurors.

*State v. Hoffman*, 348 N.C. 548, 550, 500 S.E.2d 718, 720 (1998) (quoting *State v. Quick*, 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995)).

issue of fairness that the jury would be tasked with deciding, (Trial Tr. Vol. II 70:21–71:17).

68. As to any claim of actual prejudice, Plaintiffs stipulated that they are each white and noted that all counsel and all of Medflow's expected witnesses were white, (Trial Tr. Vol. II 90:21–25), so there was no discernible advantage to be achieved by excluding black jurors or any discriminatory inference that could be drawn, (*see* Trial Tr. Vol. II 65:9–68:8, 75:5–7, 83:1–3).

69. Defendants argued in response that Plaintiffs passed on white jurors that were similarly situated to the black jurors struck with respect to education and technological literacy, such that the proffered justification must be considered pretextual. (Trial Tr. Vol. II 68:9–23.)

70. After hearing the parties' arguments, the Court denied the Batson Challenge, stating it was not convinced that Medflow had established even a *prima facie* case of discrimination, and if it had, Plaintiffs' justification was not pretextual. (Trial Tr. Vol. II 86:13–88:13.)

71. In its Motion for New Trial, Medflow has not argued any additional grounds for its Batson Challenge. The Court therefore adopts and affirms its denial of the Batson Challenge at trial. *See Sellers v. Ochs*, 180 N.C. App. 332, 333, 638 S.E.2d 1, 2 (2006) ("A Rule 59 motion 'cannot be used as a means to reargue matters already argued or to put forth arguments which were not made but could have been made[.]' " (citation omitted)). Medflow is therefore not entitled to a new trial as to Schiffli by way of its Batson Challenge.

### b.  Improper Closing Argument

72. Defendants claim they are entitled to a new trial because of prejudice they suffered as a result of Plaintiffs' closing arguments.

73. As an initial matter, Plaintiffs divided their closing argument at trial. Plaintiffs' counsel Christopher P. Raab ("Mr. Raab") argued on Schiffli's behalf on the issue of whether he was a *de facto* officer, and Plaintiffs' counsel Harold C. Spears ("Mr. Spears") argued on behalf of all Plaintiffs on the remaining issue of fairness. Medflow does not challenge Mr. Raab's argument but attacks several portions of Mr. Spears's argument as prejudicial, complaining that he: (1) made an improper missing witness argument by asking the jury why Scott Harris ("Harris"), Long's attorney and agent, did not testify; (2) referred to Medflow's counsel as being out-of-state; (3) accused Medflow's counsel, Aaron Z. Tobin ("Mr. Tobin"), of misrepresenting evidence in his opening statement although Mr. Spears referred to the same evidence in his opening; (4) argued law to the jury that does not exist; and (5) inflamed the jury's passions by posing provocative rhetorical questions. (Def.'s Mot. J., JNOV, & New Trial 2–3.)

74. North Carolina law affords attorneys "wide latitude" to argue their cases to the jury. *Corwin v. Dickey*, 91 N.C. App. 725, 728, 373 S.E.2d 149, 151 (1988) (citing *Pence v. Pence*, 8 N.C. App. 484, 488, 174 S.E.2d 860, 862 (1970)). "[C]omment of counsel is ordinarily left to the sound discretion of the trial judge, and the reviewing court will reverse [the] decision . . . only when it is clear that counsel's impropriety was gross and well calculated to prejudice the jury." *Id.* (citing *Lamborn v.*

*Hollingsworth*, 195 N.C. 350, 353, 142 S.E. 19 (1928)). Furthermore, " '[n]ew trials are not awarded because of technical errors. The error must be prejudicial[,]' " *Sisk v. Sisk*, 221 N.C. App. 631, 635, 729 S.E.2d 68, 71 (2012) (citation omitted), and " '[t]he party asserting the error must demonstrate that he has been prejudiced thereby[,]' " *id.* (citation omitted).

75. Here, Medflow must demonstrate that Mr. Spears's closing argument was so egregious that the Court committed reversible error by failing to intervene *ex mero motu* because Medflow did not contemporaneously object to Mr. Spears's closing. *See State v. Taylor*, 363 N.C. 514, 545, 669 S.E.2d 239, 264 (2008); (*see also* Trial Tr. Vol. XI 110:10–12 ("We didn't want to interrupt Plaintiff's closing and I know that that puts us in the Court's discretion as to whether this meets the grossly improper standard.")).

### i. Missing Witness

76. In closing, Mr. Spears asked the jury to consider why Harris was not present to testify despite the emphasis Medflow's counsel placed in argument and throughout trial on an e-mail in which Harris, acting as an agent of Long, asked Throneburg to provide financial information about Medflow and urged him not to "hide the ball." (Trial Tr. Vol. XI 77:14–78:25.)

77. Medflow argues it was improper for Mr. Spears to draw attention to the fact that Harris did not testify but cites no controlling North Carolina authority in support. (*See* Def.'s Br. Supp. Mot. J., JNOV, & New Trial Against Schiffli, & Br. Opp'n Schiffli's Mot. Entry J. 10–11 (citing *Gillespie v. Chrysler Motors Corp.*, 553

N.E.2d 291, 300 (Ill. 1990) (holding that it is improper for counsel to make a missing-witness argument in closing when that witness is outside of the party's control and the court's subpoena power).)

78. Schiffli counters that *Murchison v. Reg'l Surgical Specialists*, No. COA18-297, 2019 N.C. App. LEXIS 453 (N.C. Ct. App. May 21, 2019), instructs that Mr. Spears properly advanced the reasonable inference that Medflow had but did not exercise the power of producing Harris's testimony, either by having him appear in person or securing his testimony by deposition, including, if necessary, by taking a *de benne esse* deposition. (Schiffli's Mem. Opp'n Defs.' Mot. J. JNOV, & New Trial 14); *see Murchison*, 2019 N.C. App. LEXIS 453, at *7 (holding a trial court did not abuse its discretion by denying a motion for new trial where defense counsel argued there were witnesses to the plaintiff's medical condition that were not called to testify).

79. *Murchison* is instructive even though it is unpublished and otherwise distinguishable from the case at bar. In holding that counsel's arguments did not travel "outside of the record in an improper manner," the *Murchison* court observed that, when commenting to the jury about potential reasons why certain witnesses were not called to testify, those "statements were not made for the purpose of buttressing the Defendants' own evidence, but seemingly to flesh out inferences defense counsel believed reasonably followed [the] testimony." *Murchison*, 2019 N.C. App. LEXIS 453, at *8.

80. The Court similarly construes Mr. Spears's commentary on Harris's absence as an attempt to remediate and "flesh out inferences" made by Medflow's

counsel in its closing argument. Mr. Tobin, arguing on behalf of Medflow in closing, stated:

> This is the Scott Harris June 20th email to Mr. Throneburg, CEO. He's asking for financial information. He is obviously – my interpretation, not be kept – he's been kept in the dark because – he says we want to know the company's finances since the management change. Does the company keep financial reports? How does it know how it's going? Does it not even have gross revenue numbers? Is there any information I can get from Bill Schiffli, who identifies himself as the chief financial officer of the company, to fill this vacuum? Please keep in mind the shareholders' experience with the old regime. They withheld information. They were hiding the ball and being unresponsive to shareholders' requests. As a shareholder, our client, meaning DavLong, demands much – he didn't say demands, but looks forward to much greater accountability and transparency from Medflow's current executive team and I expect them to distinguish themselves from what's happened in the past.

(Trial Tr. Vol. XI 21:23–22:15.)

81. Mr. Tobin placed significant emphasis on Harris's e-mail to challenge Plaintiffs' credibility and the fairness of their having executed their agreements without disclosure to Medflow's shareholders. Particularly, Medflow speculated on Harris's motivation in sending that e-mail and the significance of Harris's word choice to Plaintiffs' detriment despite apparently never having an intent to call Harris as a witness. (*See* Pretrial Order 4, ECF No. 321 (failing to list Harris as a potential witness).)

82. Mr. Spears's closing attacked Medflow's use of the Harris e-mail as one illustration of Medflow's apparent strategy of building its defense on false premises. Mr. Spears argued:

> All of those requests, the comment about don't hide the ball, dealt with financial records and the things Long was looking for. Remember the

shareholders were very dissatisfied when Riggi was running it because they couldn't even get the financials before the annual meeting. That's what those communications were about. It's a − it's a − just a misrepresentation that that is something different, that it applies to everything. Again, a false, false premise.

And if it's not − and if it's not a false premise, if this − if this note from Mr. Throneburg isn't the truth, then where is Scott Harris? Where is Scott Harris? Why isn't he here? Why didn't he come in and testify? If what that note says and what Mr. Throneburg testified to and Mr. Ehmann testified to about the very purpose of all this isn't absolutely completely 100 percent the truth, then where is Mr. Harris to say it was different? Where is Mr. Harris to say that he was looking for some more information that wasn't provided in April, June, July? Where is it? He's not. Why? Because he would just confirm that what the Plaintiffs have said is true. And that what the Defense has said is just utterly false. A false premise.

(Trial Tr. Vol. XI 78:3–25.)

83. The Court concludes, in its discretion, and based on the authorities cited, that Mr. Spears was within the bounds of permissible argument and his argument did not rise to the level of "such gross impropriety to entitle [Medflow] to a new trial[.]" *Couch v. Private Diagnostic Clinic*, 133 N.C. App. 93, 100, 515 S.E.2d 30, 36 (1999) (citation omitted); *see State v. Vines*, 105 N.C. App. 147, 157, 412 S.E.2d 156, 163 (1992) (holding that the prosecutor's argument attacking the integrity of defense counsel was grossly improper but not sufficiently prejudicial to require a new trial).

## ii.      Reference to Out-of-State Counsel

84. Medflow asserts it was prejudiced because Mr. Spears referred to defense counsel as being from out of state. (*See* Trial Tr. Vol. XI 71:20–21 ("Do you think that – I don't know, two law firms out of state, out of town . . .").) Medflow argues that statement warrants a new trial as to Schiffli because: (1) it is false, (2)

there is no legitimate purpose for making that statement, and (3) that information was not in evidence. (*See* Def.'s Br. Supp. Mot. J., JNOV, & New Trial Against Schiffli, & Br. Opp'n Schiffli's Mot. Entry J. 11.)

85.    Again, Mr. Spears's statement must be considered in context. At the beginning of jury selection when Medflow's lead counsel, Mr. Tobin, introduced himself, he stated that he lives in Texas but is also licensed to practice law in North Carolina.[11] (*See* Civil Trial Tr. Vol. I of XII Mon., Apr. 22, 2019 133:23–134:5, ECF No. 374.1 ("[M]y name is Aaron Tobin. . . . I practice in Dallas, Texas at the firm Condon Tobin. . . . I am licensed here in North Carolina. I practice quite a bit in North Carolina. I split my time between North Carolina and Texas.").) On balance, and in its discretion, the Court finds that Mr. Spears's reference to Medflow having out-of-state counsel, to the extent it caused any prejudice at all, was not sufficiently prejudicial to warrant a new trial.

### iii.    **Improper Forecast of Evidence**

86.    Medflow contends that Mr. Spears prejudicially argued that Mr. Tobin, in his opening statement, misrepresented that there would be no evidence that Plaintiffs intended to include any change-of-control bonuses in their contracts until July 2014. Medflow contends that the argument was particularly unfair because Mr.

---

[11] Four attorneys appeared on behalf of Medflow at the Severed Issue Trial: Mr. Tobin, Michele Spillman ("Ms. Spillman"), Jared T.S. Pace ("Mr. Pace"), and Matthew Nis Leerberg ("Mr. Leerberg"). Messrs. Tobin and Leerberg are admitted to practice law in North Carolina. At the time of the Severed Issue Trial, Mr. Leerberg resided in North Carolina, and Ms. Spillman and Mr. Pace resided in Texas.

Spears made the same representation in his opening statement. (Def.'s Br. Supp. Mot. J., JNOV, & New Trial Against Schiffli, & Br. Opp'n Schiffli's Mot. Entry J. 11.)

87.     In opening, Mr. Spears narrated Throneburg's process of drafting the employment agreements over the July 4th weekend, including his decision to add the Change-of-Control Payment term to the contract. (Trial Tr. Vol. II 200:24–202:3.) However, Mr. Spears did not represent that the July 4th weekend was the first time a change-of-control bonus was considered or discussed between the Plaintiffs.

88.     In contrast, in his opening statement, Mr. Tobin represented that there would be no "evidence whatsoever of these employment contracts until July 4, 2014," (Trial Tr. Vol. II 206:19−20), and further that "what the evidence is going to show is that there is no mention whatsoever of a change of control payment, a severance payment, any type of gross up factor at all until July 4th, a couple days after they hear the company's going to be sold[,]" (Trial Tr. Vol. II 210:17–21).

89.     In closing, Mr. Spears did not challenge the argument that there was not a change-of-control provision in the contracts before July 4, 2014, but he noted that "Defense counsel also said that there was no mention of the change of control provisions until July[,]" which Mr. Spears then attacked as "utterly, completely false." (Trial Tr. Vol. XI 85:25–86:11.)

90.     The trial testimony included not only that Throneburg did not begin drafting Plaintiffs' employment agreements until the July 4, 2014 weekend before their execution on July 8, 2014, but also that Throneburg and Schiffli discussed change-of-control bonuses in April 2014. (Trial Tr. Vol. VIII 71:19–72:25.)

Throneburg also produced documentary evidence that he began collecting agreements he might use as templates for drafting Plaintiffs' agreements several months before July 2014, and that at least some of those templates had change-of-control provisions. (*See* Trial Tr. Vol. VIII 71:19–72:25, 99:20–100:6.)

91.     The Court repeatedly instructed the jury that opening statements and the arguments of counsel do not constitute evidence. In the overall context of the record, and in its discretion, the Court concludes that neither Mr. Tobin's representation of the timing of the agreements in his opening statement nor Mr. Spears's challenge to Mr. Tobin's representation was so out of bounds that the Court should grant relief. *Cf. In re Estate of Raney*, No. COA10-1480, 2011 N.C. App. LEXIS 1904, at * 26–27 (N.C. Ct. App. Sept. 6, 2011) (holding that attorney's publication of evidence to the jury for the first time during closing argument, although "poor trial practice, was not an act of skullduggery" warranting a new trial).

### iv.     Mischaracterization of Law or Custom

92.     Medflow argues that Mr. Spears improperly told the jury to consider law that does not exist. The argument must be considered in the context of the proceedings in the case. Medflow's consistent position throughout this litigation has been that Plaintiffs intentionally failed to submit their employment agreements for review by outside counsel or Medflow's shareholders prior to execution of the agreements. Plaintiffs have responded that the law does not require that they do so. The Court instructed the jury to consider all the facts and circumstances surrounding

the execution of the agreements when determining whether Plaintiffs met their burden of proving their contracts were fair.

93. In his closing argument, Mr. Spears stated:

> There is no ordinary and customary practice in private companies in North Carolina . . . that shareholder approval is required or outside counsel is required to do any of these contracts. And you will not hear that from the judge, that there is a customary practice that is usually followed because it doesn't exist. And you know what? If they did exist, do you think that you would have heard about it?

(Trial Tr. Vol. XI 71:12–20; *see* Schiffli's Mem. Opp'n Defs.' Mot. J. JNOV, & New Trial 15–16.)

94. There are multiple reasons why this argument does not warrant a new trial as to Schiffli. First, the Court fully and repeatedly instructed the jury that only the Court could advise them as to what law governs their deliberation and that statements of counsel were neither evidence nor binding instruction. Second, it is appropriate for counsel to argue to the jury that it should consider not only the law included in the Court's instructions, but also the absence of any mention in those instructions of law supporting arguments upon which the opposing party has relied. Third, because the jury never reached consideration of the issue of fairness with respect to Schiffli, any potential prejudice resulting from an erroneous characterization of law or custom by Mr. Spears never came to bear.

95. Based on the record, and in its discretion, the Court concludes that the jury was not misled, and Medflow was not unfairly prejudiced because of any potential misrepresentation of law by Mr. Spears. *See State v. Trull*, 349 N.C. 428,

452, 509 S.E.2d 178, 194 (1998) (holding that where counsel made a misstatement of law in his closing argument, the trial court's instructions cured any prejudice).

### v. **Prejudicial Rhetorical Questions**

96. Medflow contends that Mr. Spears inflamed the passions of the jury by asking improper rhetorical questions in his closing argument. (Def.'s Br. Supp. Mot. J., JNOV, & New Trial Against Schiffli, & Br. Opp'n Schiffli's Mot. Entry J. 12.) Further elaborating on his argument that Medflow pursued a defense based on "false premises," in closing Mr. Spears argued:

> You know, what's a false premise? You know – excuse me. The classic example is you say, how often do you abuse your spouse? When's the last time you got treatment for your abusive conduct? It's presuming that you assaulted somebody, that you were abusive to somebody, that you need treatment. The minute that question is asked, you look at people differently. Oh, you're an abuser? You know, immediate negative connotations from the way this thing happened.

(Trial Tr. Vol. XI 67:4–12.)

97. In the context of the overall evidence in the case, the Court concludes, in the exercise of its discretion, that Mr. Spears' argument was a proper attack on Medflow's express or implied argument that Plaintiffs' employment agreements should be deemed unfair to Medflow solely because they had not been submitted to outside counsel or shareholders, and that argument did not rise to a level of a gross impropriety adequate to compel a new trial as to Schiffli. *Compare Helbein v. Helbein*, No. COA 18-383, 2019 N.C. App. LEXIS 249, at * 19–21 (N.C. Ct. App. Mar. 19, 2019) (holding that a reference to the opposing party and counsel engaging in "misleading trickery" was improper but did not rise to the level of gross impropriety

needed to warrant a new trial), *with Corwin*, 91 N.C. App. at 728, 373 S.E.2d at 151 (holding that defendant's counsel's argument was grossly improper where he argued that any monetary judgment would go to the lawyers and that it was not "Christian to sue for money").

98. Schiffli also argues that because it was Mr. Raab that argued the *de facto* officer issue—the only issue which the jury considered with respect to Schiffli—none of Mr. Spear's statements could have created prejudice adequate to vacate the jury's verdict as to Schiffli. (Schiffli's Mem. Opp'n Defs.' Mot. J. JNOV, & New Trial 16–17.) Medflow responds that because Messrs. Raab and Spears "conducted the entire trial on behalf of all three Plaintiffs[, t]heir strategic decision to divide the labor at closing arguments did not segregate their unified representation." (Reply Supp. Def.'s Mot. J., J. Notwithstanding Verdict, & New Trial Against Schiffli 3, ECF No. 359.)

99. The Court need not consider this argument because it has concluded that Medflow has not shown that Mr. Spears's arguments were improper in the first instance or otherwise demonstrated prejudice. *See Sisk*, 221 N.C. App. at 635, 729 S.E.2d at 71 (holding that the plaintiff was not entitled to a new trial, in part, because she had not shown prejudice).

100. In sum, having considered each of the bases on which Medflow seeks a new trial as to Schiffli individually and collectively, the Court concludes that Medflow's motion for new trial should be denied.

**B.      Cross-Motions for JNOV as to Ehmann and Throneburg**

101.    Ehmann, Throneburg, and Medflow argue that, although the jury was unable to reach a unanimous verdict on the issue, they are each entitled to JNOV on the question of whether the employment agreements were fair to Medflow at the time they were entered.

**(1)      Ehmann and Throneburg's JNOV Motion**

102.    Ehmann and Throneburg argue that the evidence presented at trial entitles each of them to a judgment that their respective employment agreement was fair to Medflow when entered.[12]  Their burden at trial was to show, "by the greater weight of the evidence," "the overall facts and circumstances . . . that were known or should have been known at the time the transaction[s] [were] entered[,]" demonstrated the agreements were entered into "openly and honestly," and the terms of those agreements were "in the range of what might have been entered at arm's length by disinterested persons." (Jury Instrs. 11–12); *see* N.C.G.S. § 55-8-31, cmt. 4.

103.    Ehmann and Throneburg contend, given that there was no evidence of a lack of openness or honesty, the only finding that should have resulted from the evidence presented at trial was that their agreements were consistent with arm's length transactions. (Mem. Supp. Ehmann & Throneburg's Mot. J. Notwithstanding Verdict 4, ECF No. 334.)  Ehmann and Throneburg emphasize that they presented

---

[12] Ehmann and Throneburg also carry forward their argument that the Court erroneously refused to allow Plaintiffs to rely on the business judgment rule to shield them from the obligation of proving the fairness of their employment agreements at the time they were entered.  Without repeating its basis for doing so, the Court adheres to its prior rulings rejecting Plaintiffs' position.

expert testimony while Medflow did not, and Plaintiffs' experts Kevin Walker ("Walker") and Thomas Henson ("Henson") testified that the terms of the employment agreements were consistent with an arm's length negotiation.

104. The Court finds Ehmann and Throneburg's argument unavailing. First, the burden of proving fairness was on Plaintiffs, and Ehmann and Throneburg cannot satisfy their own burdens of proof on the issue of fairness with the expedient argument that Medflow did not put on its own expert testimony that the agreements were unfair.

105. Second, while the Court correctly instructed the jury to consider all facts and circumstances surrounding the execution of Plaintiffs' employment agreements, the jury was not required to accept any expert testimony. N.C.P.I.-Civil 101.25; (Jury Instrs. 2–3.)

106. Third, Walker and Henson specifically testified that they did not consider the fairness of the negotiation process and only opined on the appropriateness of the substantive terms of the agreements. (*See, e.g.*, Trial Tr. Vol. VI 130:6–12 ("I also did not review at all process, the process by which [the agreements] might have been executed. I simply took these agreements and some other ancillary agreements, read them, considered the facts or took the facts that were stated and the preambles as being true and then I made a determination.").)

107. When ruling on Ehmann and Throneburg's JNOV Motion, the Court is required to view the evidence most favorably to Medflow. The Court concludes that there was ample evidence on which Medflow based its contention that the jury should

find in its favor on the issue of fairness. The Court, in the exercise of its discretion, therefore concludes that Ehmann and Throneburg's motion for JNOV should be denied. *See N.C. Nat'l Bank v. Burnette*, 297 N.C. 524, 536, 256 S.E.2d 388, 395 (1979) (stating that JNOV motions brought by the party with the burden of proof are "rarely granted").

### (2)   Medflow's JNOV Motion

108.   Medflow contends that the evidentiary record, even considered in Plaintiffs' favor as the JNOV standard requires, compels a finding as a matter of law that Ehmann and Throneburg's agreements were unfair to Medflow at the time they were entered. In part, Medflow's argument restates the position, which the Court previously rejected in its Summary Judgment Opinion, that procedural unfairness alone renders Plaintiffs' employment agreements unenforceable. *See Ehmann*, 2017 NCBC LEXIS 88, at *52–58; (Resp. Opp'n Throneburg & Ehmann's Mot. J. Notwithstanding Verdict 4–6, ECF No. 359.) The Court adheres to its ruling that procedural unfairness is but one of the factors the jury is to consider when resolving the issue of fairness of the employment agreements and concludes it properly instructed the jury to this effect. (*See* Jury Instrs. 9–10.)

109.   The jury ultimately determined that it could not unanimously agree that Ehmann and Throneburg sustained their burden of proving their agreements were fair to Medflow when entered. But the record contained more than a scintilla of evidence, including both fact and expert testimony, upon which the jury could have ruled in Plaintiffs' favor, and that evidence is adequate to defeat Medflow's motion

for JNOV.  Upon that record, and in the exercise of its discretion, the Court concludes that Medflow's JNOV motion should be denied.  *See N.C. Indus. Capital, LLC v. Clayton*, 185 N.C. App. 356, 363, 649 S.E.2d 14, 20 (2007) (holding trial court did not err in denying JNOV in the plaintiff's favor where there was more than a scintilla of evidence in support of the defendant's assertion).

### C.  Medflow's Motion for New Trial as to Ehmann and Throneburg

110.  With the jury having been unable to reach a unanimous verdict as to whether Ehmann and Throneburg proved their employment agreements were fair to Medflow when entered, the Court agrees that it should declare a mistrial on those issues and order that they be tried again before a jury.  Accordingly, Medflow's motion for new trial on these issues should be granted.[13]  *See State v. Harris*, 198 N.C. App. 371, 376, 679 S.E.2d 464, 468 (2009) ("When a . . . trial results in a hung jury[,] . . . a new trial is ordered[.]").

---

[13] For the Severed Issue Trial, the parties agreed to limit testimonial and documentary evidence to events that transpired through and including July 8, 2014.  (Stipulation Regarding Scope Evid. Trial Severed Issue 1, ECF No. 295.)  The parties have not been able to agree to carry forward the same limitation for any subsequent trial.  Without that stipulation, the Court deems it inefficient to limit a retrial on Ehmann and Throneburg's claims to the Severed Issue.  Accordingly, all of Ehmann and Throneburg's claims will be tried together.  (*See generally* Order Declaring Mistrial, Unsevering Case, & Granting Pls.' Request Judicial Notice, ECF No. 371.)  Because the Court concludes below that Schiffli is only entitled to a partial summary judgment on his contract claim, the Court must separately consider whether a final resolution of the remaining issues of material fact with respect to Schiffli's contract should be tried separately or should await a joint trial with Ehmann and Throneburg.  As stated in greater detail below, the extent of Schiffl's contract remedies may be easily determined in a standalone trial, while other issues common among Ehmann, Throneburg, and Schiffli, may be tried together.

**D.    Schiffli's Motions for Entry of Judgment and for Summary Judgment**

111.    The jury unanimously concluded that Schiffli was not a *de facto* Medflow officer when he entered his employment agreement.  (Verdict Sheet 1.)  In light of that verdict, Schiffli now moves for a judgment that he is then entitled to unpaid wages, a Change-of-Control Payment, and Severance Benefits pursuant to his employment agreement.

**(1)    Entry of Judgment on Jury Verdict**

112.    Schiffli asserts that entry of judgment in his favor should not be precluded by the jury's inability to reach a unanimous verdict on the issues regarding Ehmann and Throneburg's agreements.  (Mem. Supp. Mot. Entry J. Verdict & Summ. J. Mot. 2–3, ECF No. 328 (citing *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 188, 594 S.E.2d 1, 20 (2004) ("[T]here are two distinct verdicts based upon causes of action for individual plaintiffs.")).)  The Court agrees.  (*See* Order Regarding Scheduling & Severance Issue Trial 1 ("The Severed Issue shall be decided separately for each Plaintiff.").)

113.    The Court determines and adjudges that the jury has finally and conclusively determined that Schiffli was not a Medflow officer when he entered his employment agreement.  For reasons discussed below, the Court further concludes that the effect of the jury's verdict is that Schiffli does not have the burden of proving that his employment agreement was fair to Medflow when it was entered, and that Schiffli is entitled to summary judgment that he was not a Medflow fiduciary at any pertinent time that would bar him from recovery under his contract.

**(2)     Schiffli's Motion for Summary Judgment**

114.    Armed with the jury's verdict in his favor on the issue of whether he was a *de facto* officer when negotiating and executing his employment agreement, Schiffli renews his 2016 Summary Judgment Motion and requests a summary judgment that: (1) Defendants' affirmative defenses and counterclaims for breach of fiduciary duty and constructive fraud fail; (2) his employment agreement is valid and enforceable in accordance with its terms; (3) Medflow did not terminate his employment agreement for Cause; (4) he terminated his agreement for Good Reason; (5) he is accordingly entitled to unpaid wages, a Change-of-Control payment, and Severance Benefits as provided by his agreement; and (6) Medflow's liability is chargeable against Holdings. (Mot. Entry J. Jury Verdict & Summ. J. Mot. 2.)

**a.     Holdings's Liability**

115.    Holdings stipulated that it is responsible for any judgment against Medflow, (*see* Defs.' Resp. Opp'n Pls.' Mot. Prejudgment Relief 2, ECF No. 346 ("The Defendants have stipulated that Medflow Holdings will ensure that any judgment rendered against Medflow, Inc. gets paid.")), and this Court has already determined that Holdings is judicially bound by that admission and shall be charged with whatever liability may result against Medflow regarding Plaintiffs' employment agreements, (*see* Order Declaring Mistrial, Unsevering Case, & Granting Pls.' Request Judicial Notice 5 (noting that Holdings admitted that it is the corporate successor of Medflow)). The Court concludes that it has already made a final ruling

that Holdings may be charged with any liability against Medflow to any Plaintiff, and the Court need not reconsider the issue on Schiffli's summary judgment motion.[14]

### b. Medflow Defendants' Counterclaims and Affirmative Defenses for Breach of Fiduciary Duty and Constructive Fraud

116. Medflow Defendants challenged each of Plaintiffs' employment agreements on several grounds, including by contending that they are unenforceable because they were procured through transactions in breach of Plaintiffs' fiduciary duties and amount to constructive fraud. (Medflow Defs. Answer & Countercl. 23, 36–37, 39.) The jury's verdict conclusively establishes that Schiffli owed no fiduciary duty to Medflow by reason of being a *de facto* officer at the time he entered his employment agreement. Schiffli argues that he is entitled to recover under his contract and Medflow Defendants' counterclaims for breach of fiduciary duty and constructive fraud must fail because Medflow Defendants have no remaining basis to argue that he breached a fiduciary duty actually owed to Medflow.

117. Although Medflow Defendants did not specifically assert the argument in their counterclaims, Medflow now contends that Schiffli should be barred from recovering under his contract because, even if he owed no fiduciary duties at the time he entered the agreement, he owed such duties at the time he later sought to enforce it. Medflow argues both that Schiffli's summary judgment motion is premature because Medflow has not had the benefit of taking discovery on its counterclaims, and

---

[14] As noted earlier, the Court does not consider here whether, with the exception of Holdings, Medflow's liability can be charged against other Defendants including SNIC, or whether the Court should set aside any conveyance or transfer of Medflow's assets between Defendants.

that, once that discovery is complete, it will demonstrate that Schiffli was a Medflow fiduciary because he exercised dominion and control over Medflow at the time he sought to enforce his agreement. (Def.'s Resp. Opp'n Schiffli's Mot. Summ. J. 10−14, ECF No. 352.)

118. The Court sees no need for discovery on the issue of whether Schiffli was Medflow's fiduciary when he asserted his right to benefits under his employment agreement. The record is clear that Ehmann reappointed Schiffli as a Medflow officer in December 2014 before Schiffli brought this action to enforce his agreement. (Dec. 9, 2014 Director Action 1 (memorializing Ehmann's appointment of Schiffli as Treasurer/CFO); Reply Defs.' Am. Countercl. ¶ 1, ECF No. 190 (admitting "that Schiffli served as an officer of Medflow, Inc. from December 19, 2014 through approximately October 14, 2015").)

119. The relevant question is whether a later-acquired fiduciary duty precludes Schiffli from receiving the benefits of the employment agreement he entered at a time when he owed no such duty. Medflow has cited no authority to support that theory. While the Court deemed it material whether Schiffli owed fiduciary duties to Medflow at the time he entered his agreement and therefore had a duty to prove fairness, *see Ehmann*, 2017 NCBC LEXIS 88, at *42−45, it concludes there is no basis to find that a later-acquired fiduciary duty bars Schiffli from enforcing his earlier-entered agreement. Medflow has offered no proof that Schiffli owed a fiduciary duty to Medflow when he entered his employment agreement other than his status as a *de facto* officer. The Court then concludes that the jury verdict

in Schiffli's favor forecloses Medflow Defendants' breach of fiduciary duty and constructive fraud counterclaims against him as a matter of law, and they should be dismissed.

### c. Medflow's Other Challenges to the Enforceability of Schiffli's Agreement

120. Medflow challenges Schiffli's employment agreement on several bases that do not rest on Schiffli having breached a fiduciary duty owed to Medflow. Specifically, Medflow contends that the terms of the agreement are so egregious and unfair to Medflow that they should be stricken for unconscionability, and the agreement as a whole is unenforceable because it results in corporate waste. (Def.'s Resp. Opp'n Schiffli's Mot. Summ. J. 1.)

### i. Unconscionability

121. In its Summary Judgment Opinion, the Court stated, "[i]n th[e corporate] context, the concept of unconscionability is more often referred to as a claim of corporate waste. If compensation terms rise to the level of being so egregious that no disinterested board could approve them in good faith, then the agreements may be found to constitute corporate waste." *Ehmann*, 2017 NCBC LEXIS 88, at *58 (citing *Robinson on North Carolina Corporate Law* § 16.11, at 16–25 (7th ed. 2016), and *Grimes v. Donald*, 673 A.2d 1207, 1215 (Del. 1996) (holding that the business judgment rule cannot protect compensation decisions which are so egregious as to constitute corporate waste)). The Court concluded that, at least in the context of an attack on a corporate officer's compensation, "unconscionability collapses into the overall issue of fairness." *Ehmann*, 2017 NCBC LEXIS 88, at *59. The Court must

now consider Medflow's assertion of unconscionability against Schiffli, who has been determined not to be an officer.

122. Whereas Ehmann and Throneburg have the burden of proving the fairness of their agreements as officers, the burden is on Medflow to ultimately prove that Schiffli's agreement was so unfair as to be unenforceable under the doctrine of unconscionability. As an initial matter, it is unclear whether North Carolina's appellate courts would or should recognize the application of the unconscionability doctrine to employment agreements for corporate leadership, but even if they did, the elements of any such claim would include proof of procedural and substantive unfairness. The Court concludes as a matter of law that Medflow has not forecasted evidence adequate to meet its burden on those elements.

123. Unconscionability was traditionally conceived of as a defense to enforcement of a contract for the sale of goods, *see* N.C.G.S. § 25-2-302, but has also been applied to common law contracts, *see, e.g.*, *Rite Color Chem. Co. v. Velvet Textile Co.*, 105, N.C. App. 14, 18−19, 411 S.E.2d 645, 647−48 (1992) (citing cases). North Carolina courts have never addressed unconscionability in the corporate context, but courts outside of North Carolina have associated the term "unconscionability" with corporate waste. *See, e.g.*, *Brehm v. Eisner*, 746 A.2d 244, 262 n.56 (Del. 2000) ("[D]irectors have the power, authority and wide discretion to make decisions on executive compensation. . . . [T]here is an outer limit to that discretion, at which point a decision of the directors on executive compensation is so disproportionately large as to be unconscionable and constitute waste." (internal citations omitted)).

124. Medflow is unable to cite North Carolina precedent in support of its unconscionability argument. It urges, however, that North Carolina law creates no *per se* impediment to a corporation's ability to raise an unconscionability defense, (*see* Defs.' Suppl. Br. Regarding Pls.' Mots. Partial Summ. J. 12, ECF No. 232), citing *Leventhal v. New Valley Corp.*, No. 91 Civ 4238 (CSH), 1992 U.S. Dist. LEXIS 456, at *18–19 (S.D.N.Y. Jan. 17, 1992).

125. In *Leventhal*, after a terminated officer's ex-employer ceased making severance payments under an employment contract, the officer sued the employer for breach of that contract, and the employer raised unconscionability as an affirmative defense. While the *Leventhal* Court considered the corporate defendant's defense in passing, it succinctly granted summary judgment in favor of the officer because, given that New York law "require[d] a showing of 'lack of meaningful choice,' . . . [the] corporate defendant [wa]s in no position to avail itself of the unconscionability doctrine." *Id.* at *18–19; *see* 1 E. Farnsworth, *Contracts,* § 4.28 at 505 n.41 (observing that courts "have declined to apply the [unconscionability] doctrine in favor of sophisticated corporations")).

126. As such, *Leventhal*'s holding actually supports Schiffli's position and anchors the Court's conclusion that, assuming for argument that North Carolina courts would extend the unconscionability doctrine to the current context, Medflow was required to but has failed to come forward with evidence adequate to satisfy the essential elements of unconscionability.

127. North Carolina precedent dictates that

> [a] court will generally refuse to enforce a contract on the ground of unconscionability only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other. In determining whether a contract is unconscionable, a court must consider all the facts and circumstances of a particular case. If the provisions are then viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable.

*Brenner v. Little Red Sch. House, Ltd.*, 302 N.C. 207, 213, 274 S.E.2d 206, 210 (1981) (internal citations omitted) (finding no unconscionability because there was no "inequality of bargaining power between the parties" and the plaintiff "was not forced to accept [the] defendant's terms"). That is, "[i]n order to establish unconscionability, [Medflow must] show both procedural unconscionability and substantive unconscionability." *Wilner v. Cedars of Chapel Hill, LLC*, 241 N.C. App. 389, 392, 773 S.E.2d 333, 336 (2015) (citation omitted).

128. Procedural unconscionability

> involves bargaining naughtiness in the formation of the contract and is equated with . . . unfair surprise . . . and with . . . lack of meaningful choice. The term encompasses not only the employment of sharp practices and the use of fine print and convoluted language, but a lack of understanding and inequality of bargaining power.

*Rite Color Chem. Co.*, 105 N.C. App. at 20, 411 S.E.2d at 648 (internal citations and quotation marks omitted). Bargaining naughtiness has also been defined as "fraud, coercion, undue influence, misrepresentation, [and] inadequate disclosure." *Johnson v. Johnson*, 259 N.C. App. 823, 831, 817 S.E.2d 466, 473 (2018).

129. "Substantive unconscionability . . . involves the harsh, oppressive, and one-sided terms of a contract from which a party seeks relief[, and which] are

generally characterized as being unreasonably favorable to the other party to the contract." *Rite Color Chem. Co.*, 105 N.C. App. at 20, 411 S.E.2d at 648−49 (internal citations and quotation marks omitted).

130. Critically,

[a]lthough there is some confusion among the commentators as to whether a court may determine a contract to be unconscionable on the basis of only one of the two elements described above, [the North Carolina Court of Appeals] has previously held that "[t]o find unconscionability there must be an absence of meaningful choice on part of one of the parties (procedural unconscionability) *together with* contract terms which are unreasonably favorable to the other (substantive unconscionability)."

*Id.*, 411 S.E.2d at 649 (emphasis in original) (quoting *Martin v. Sheffer*, 102 N.C. App. 802, 805, 403 S.E.2d 555, 557 (1991)). "The question of unconscionability is determined as of the date the contract was executed." *Weaver v. Saint Joseph of the Pines, Inc.*, 187 N.C. App. 198, 212, 652 S.E.2d 701, 712 (2007) (citation omitted).

131. When attacking Schiffli's agreement, Medflow focuses on actions of parties other than Schiffli and standards that would have applied if Schiffli were an officer when negotiating and entering his agreement with Medflow. (*See* Def.'s Resp. Opp'n Schiffli's Mot. Summ. J. 6–7.) Medflow has presented no evidence from which a fact-finder could conclude there was bargaining naughtiness by Schiffli, or unequal bargaining power between Schiffli and Medflow such that Medflow had no meaningful choice but to enter the agreement. *See Emerald Portfolio, LLC v. Outer Banks/Kinnakeet Assocs., LLC*, 249 N.C. App. 246, 254, 790 S.E.2d 721, 727 (2016) ("In the absence of *any* procedural unconscionability, it cannot be said that the guaranty agreement was unconscionable."); *Wilner*, 241 N.C. App. at 393−94, 773

S.E.2d at 337 (finding insufficient evidence of procedural unconscionability where "plaintiffs alleged only that defendants were more sophisticated and drafted the contracts to their own benefit[,]" and insufficient evidence of substantive unconscionability where the "plaintiffs lacked the ability to negotiate contract terms").

132. The Court therefore concludes that Schiffli is entitled to summary judgment in his favor on the issue of unconscionability, whether Medflow styles its unconscionability attack as an affirmative defense or counterclaim.

### ii. Corporate Waste

133. Medflow recasts it unconscionability argument as a defense of corporate waste. It is again significant that the jury has conclusively determined that Schiffli was not a Medflow officer when negotiating and executing his employment agreement.

134. Corporate waste is a breach of a corporate fiduciary's affirmative obligation under the duty of loyalty to "strive to advance the best interests of the corporation." *Seraph Garrison, LLC v. Garrison*, No. COA14-1166, 2016 N.C. App. LEXIS 1376, at *8 (N.C. Ct. App. Apr. 19, 2016) (citing *In re Walt Disney Co. Derivative Litig.*, 2004 Del. Ch. LEXIS 132, at *5 n.49 (Del. Ch. Sept. 10, 2004)). In North Carolina, corporate waste is not a separate cause of action but is subsumed into claims for breach of fiduciary duty. *See Brady v. Van Vlaanderen*, 2013 NCBC LEXIS 34, at *9–11 (N.C. Super. Ct. July 24, 2013).

135.     In addition to having failed to prove that Schiffli owed fiduciary duties at the time he entered his agreement, Medflow has not forecasted any evidence upon which a jury could determine that Schiffli's agreement was so devoid of consideration to Medflow that it rose to the level of corporate waste.

136.     "There is little direct law in North Carolina defining corporate waste.  However, our courts frequently turn to Delaware law for guidance on matters of corporate law where North Carolina appellate decisions provide little guidance." *Johnston v. Johnston Props., Inc.*, 2018 NCBC LEXIS 119, at *38 (N.C. Super. Ct. Nov. 15, 2018) (citation omitted).

137.     Under Delaware law, the standard for corporate waste is more exacting than mere fairness:

> Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.  Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received.  Such a transfer is in effect a gift.  If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude a post that the transaction was unreasonably risky.  Any other rule would deter corporate boards from the optimal rational acceptance of risk, for reasons explained elsewhere.

*Krieger v. Johnson*, 2014 NCBC LEXIS 13, at *22 (N.C. Super. Ct. Apr. 30, 2014) (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997) (internal citations and emphasis omitted)).

> That there may be some consideration for the contract is not controlling if the value of the compensation to be paid . . . is so out of all proportion to the value of the services which [the beneficiary] would be expected to

render that no reasonable person would consider that the corporation would receive a quid pro quo[.]

*Fidanque v. Am. Maracaibo Co.*, 92 A.2d 311, 321 (Del. Ch. 1952) (citation omitted).

Therefore,

> [t]he test for waste is extreme and rarely satisfied. . . . [E]ven if a plaintiff successfully raises questions concerning the fairness of . . . compensation, he does not necessarily succeed in pleading 'the rare type of facts from which it is reasonably conceivable' that the compensation awards constituted corporate waste.

*Espinoza v. Zuckerberg*, 124 A.3d 47, 67 (Del. Ch. 2015) (citation omitted).

138.   Medflow introduced evidence at the Severed Issue Trial that Schiffli proposed an employment agreement with fewer benefits than the one he ended up receiving, and that his final agreement included items he had not requested including the Gross-Up of the Change-of-Control Payment, a security interest in Medflow's assets, and thirty-six months of Insurance Benefits post-termination.  (*See* Trial Tr. Vol. IX 67:4–68:2.)

139.   In seeking to demonstrate a viable argument for corporate waste, Medflow now also relies on the declaration of its expert David Lewin ("Lewin"), who did not testify at the Severed Issue Trial.  Lewin's report does not attack the decision to hire or retain Schiffli but questions the extent of the benefits provided to secure Schiffli's employment.   That is, Lewin opines that Schiffli received excessive consideration under his final agreement because Schiffli did not previously have an employment contract giving him significant long-term payments in the event of sale or change of control, (Exs. Def.'s Resp. Opp'n Schiffli's Mot. Summ. J. Ex. 2, at ¶ 31 ("Lewin Expert Decl."), ECF No. 352.1), Schiffli did not ask for an employment

agreement, and there is no evidence that Schiffli would have left Medflow without one, (Lewin Expert Decl. ¶ 33). Additionally, Lewin states that if Schiffli's long term employment was beneficial to Medflow then Plaintiffs had no reason to fail to advise the shareholders of the agreement, (Lewin Expert Decl. ¶ 33), that the "self-serving background" statement, security interest in Medflow's assets, and thirty-six month post-termination Insurance Benefits coverage were all "highly unusual and clearly not customary," (Lewin Expert Decl. ¶¶ 37–39), and that the Change-of-Control Payments impose a disproportionate burden on Medflow, (Lewin Expert Decl. ¶ 40).

140. Even if the Court ignores evidence inconsistent with Lewin's declaration introduced at the Severed Issue Trial,[15] Medflow's attack on the quantity of the benefits Schiffli received under his contract fails when measured against the heightened inquiry for corporate waste—whether Schiffli's services to Medflow were so devoid of value that no reasonable director would have approved Schiffli's agreement.

141. "[A]llegations that compensation is 'excessive or even lavish . . . are insufficient as a matter of law to meet the standard required for a claim of waste.' " *Espinoza*, 124 A.3d at 67 (dismissing corporate waste claim where plaintiff argued "that the average compensation for Facebook's non-employee directors is 43% higher than the average compensation for directors in a specified peer group of companies, despite Facebook's lower-than-average net income and revenue, and stock price

---

[15] For example, Schiffli testified he may have decided not to continue his employment absent a written agreement with adequate long-term protections. (Trial Tr. Vol. IV 227:15–22, 228:13–19.)

movement" because the plaintiff was essentially complaining that "some portion of defendants' 2013 compensation was above and beyond what they deserved for their performance"); *see Zucker v. Andreessen*, No. 6014-VCP, 2012 Del. Ch. LEXIS 135, at *35 (Del. Ch. June 21, 2012) ("Without question, the amount of [the former CEO's] severance may appear extremely rich or altogether distasteful to some. But, '[t]he waste doctrine does not . . . . make transactions at the fringes of reasonable decision-making its meat.'" (citation omitted)).

142. Medflow has never attacked Schiffli's work ethic or competency as a CFO. To the contrary, the trial evidence reflected that Schiffli was highly qualified and experienced, and put in longer hours than he was obligated to during the period in which he was intended to work part-time as an independent contractor. (*See* Trial Tr. Vol. IV 102:7−117:10.)

143. Having failed to advance any colorable evidence supporting a finding that Schiffli's continued employment with Medflow was devoid of value, Medflow has demonstrated no basis to pursue a claim or defense of corporate waste. Schiffli is entitled to summary judgment on that issue, and Medflow's corporate waste counterclaim against Schiffli should be dismissed. *See Espinoza*, 124 A.3d at 67–68 (holding that, without an allegation "that the all-star cast on Facebook's board is so lacking in talent or exerts so little effort that Facebook receives nothing in return for compensating its members[,] . . . the claim that Facebook paid its directors more than it should have . . . fails to state a legally cognizable claim for waste of corporate assets"); *Zucker*, 2012 Del. Ch. LEXIS 135, at *34–36 (holding the plaintiff failed to

rebut presumption of business judgment by alleging corporate waste because there was "at least some element of bilateral exchange and that there were rational bases for the Board" to pay $40 million in severance to the company's former CEO).

### iii. Validity of Execution of Schiffli's Agreement Under Medflow's Bylaws

144. Read broadly, Medlow's affirmative defenses and counterclaims challenge whether Schiffli's agreement can be avoided because it was not executed with the corporate formality required by Medflow's bylaws governing compensation of its officers. Specifically, Medflow argues that Schiffli's employment agreement "was not validly executed in the absence of independent review or shareholder approval[.]" (Def.'s Resp. Opp'n Schiffli's Mot. Summ. J. 6.) Medflow's expert Lewin opined that because Plaintiffs' agreements were executed without independent review or shareholder approval, they were not "fair, did not result from arm's length transactions, are not consistent with common contracting practices and were not in the best interests of Medflow." (Lewin Expert Decl. ¶ 19.) As to Schiffli, that argument now fails for the simple reason that the jury has determined that he was not an officer when he executed his agreement.

145. Medflow cannot point to any provision of its Amended and Restated Articles of Incorporation or its Bylaws which require any particular method that must be followed when executing employment contracts for non-directors/officers. (*See* Pl. Schiffli's Mem. Supp. Mot. Partial Summ. J. Ex. A, ECF No. 160.) Consistent with their respective powers under Medflow's bylaws and general corporate practice, Throneburg signed Schiffli's employment agreement as Medflow's CEO, and Ehmann

subsequently approved the agreement as Medflow's sole director. (Schiffli Agreement 8; Medflow Bylaws 13 (stating Throneburg had the power to "supervise and control all of the business and affairs of the corporation".)

146. Schiffli is therefore entitled to summary judgment in his favor on the issue of whether his employment agreement was executed in accordance with required corporate formality.

### d. Schiffli's Entitlement to Severance Benefits Upon Termination of His Employment Agreement, Unpaid Wages, and a Change-of-Control Payment

147. Having concluded that Schiffli and Medflow entered an enforceable employment agreement, the Court must now turn to the manner in which the agreement was terminated and Schiffli's right to benefits following the end of his employment.

148. Schiffli's employment agreement ties his entitlement to Severance Benefits to the method by which his employment was terminated. Because Schiffli's employment agreement was one for a definite term, (Schiffli Agreement ¶ 5 (providing for a three-year employment period)), it could not be terminated at will unless the agreement itself so provided, *Kurtzman v. Applied Analytical Indus., Inc.*, 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997) (citation omitted). Schiffli's agreement provided for termination under four possible scenarios: (1) by Medflow for Cause; (2) by Medflow without Cause; (3) by Schiffli for Good Reason; (4) or by Schiffli without Good Reason. Schiffli's right to Severance Benefits was barred only if Medflow terminated for Cause or Schiffli terminated without Good Reason. Otherwise,

Schiffli's right to Severance Benefits vested upon termination. (*See* Schiffli Agreement ¶ 9.)

149. Medflow does not contend it terminated Schiffli for Cause as it is defined by his agreement. To the contrary, it claims that definition is unconscionable and cannot restrict Medflow's right to terminate Schiffli. (Def.'s Resp. Opp'n Schiffli's Mot. Summ. J. 11.) Schiffli contends Medflow had no Cause as defined by the agreement, and rather that he terminated for Good Reason, entitling him to Severance Benefits. (Mem. Supp. Mot. Entry J. Verdict & Summ. J. Mot. 7–8.)

150. Termination also required notice. Paragraph 6 of Schiffli's employment agreement allowed Medflow to terminate for Cause or Schiffli to terminate with or without Good Reason with thirty days' notice, and for Medflow to terminate without Cause with ninety days' notice. (Schiffli Agreement ¶ 6.) Medflow claims it terminated the agreements effective immediately upon its delivery of the letter notifying Plaintiffs of their termination ("Cause Letter"). (V. 2nd Am. Compl. Ex. 34 ("Cause Letter"), ECF No. 118.4.)

151. Though it seeks to avoid the definition of Cause in Schiffli's agreement, Medflow does not offer an alternative definition that would measure its right to terminate, nor does it present any basis on which it was entitled to terminate without notice. Medflow further argues that the issue of termination cannot be determined on summary judgment because discovery on the issue is not complete, ignoring the

fact that it is in sole control of the evidence forming the basis for its decision to terminate Schiffli.

152. For reasons discussed below, the Court concludes that Medflow is not entitled to further discovery, and the issue of Schiffli's termination is ripe for determination by the Court. The Court further concludes that it need not determine whether there is any legal theory that supports setting aside the contractual definition of Cause because Medflow has not come forward with substantial evidence of termination for cause under the common law standard. Additionally, based on the evidence of record, Schiffli was not required to terminate the agreement for Good Reason in order to vest his right to recover Severance Benefits. Rather, the Court concludes that Schiffli is entitled to Severance Benefits because Medflow terminated him without Cause, and that he is therefore entitled to summary judgment to that effect. The monetary value of certain benefits are contested material facts that must await resolution pending further proceedings.

### i. Ripeness of Termination Issue

153. The Court finds Medflow's contention that summary judgment is premature because it has not had the opportunity to take discovery on whether Schiffli was terminated for Cause without merit. (Def.'s Resp. Opp'n Schiffli's Mot. Summ. J. 4.)

154. First, Medflow's opportunity to take discovery on the issue of Schiffli's termination was triggered when Schiffli raised the issue of the nature of his termination before the Court severed the case and limited discovery to the Severed

Issue.  Schiffli asserted that Medflow failed to terminate him for Cause in both the Second Amended Complaint and his 2016 Summary Judgment Motion.  That motion triggered Medflow's duty to respond and forecast the evidence on which it opposed the motion.  *See Dixie Chem. Corp. v. Edwards*, 68 N.C. App. 714, 717, 315 S.E.2d 747, 750 (1984) ("A motion for summary judgment allows one party to force his opponent to produce a forecast of evidence which he has available for presentation at trial to support his claim or defense." (citation omitted)).  Defendants responded to Schiffli's 2016 Summary Judgment Motion before the Court entered its order directing discovery to proceed only on the Severed Issue.

155.  Second, Medflow ignores that it is in sole possession of any evidence relevant to why it believed it had grounds to terminate Schiffli.  Significantly, even though the Cause Letter states that Medflow terminated Schiffli based on the results of an investigation of his employment at Medflow, when responding to Schiffli's 2016 Summary Judgment Motion, Medflow relied only on the Cause Letter.  On Schiffli's renewed motion for summary judgment, Medflow has again failed to forecast evidence beyond the Cause Letter supporting its decision to terminate Schiffli.

156.  Third, the discovery Medflow seeks is more accurately directed to its argument that the agreements constituted breaches of fiduciary duty, as demonstrated by its assertion that "more discovery w[ould] further reveal Schiffli's and other Plaintiffs' intent to benefit themselves through the employment agreements and to surreptitiously conceal their dealings from Medflow's shareholders and its largest customers." (Defs.' Resp. & Br. Opp'n Pl. Schiffli's Mot.

Partial Summ. J. 11, ECF No. 163.1.) Medflow has had the full benefit of discovery on the way Plaintiffs negotiated and executed their agreements in preparation for the Severed Issue Trial.

157.    The Court therefore concludes that Medflow is not entitled to additional discovery on the issue of Schiffli's termination and that the issue is now ripe for summary adjudication.

## ii.    **Cause and Good Reason**

158.    Schiffli argues that the record conclusively establishes that he terminated his employment for Good Reason in Fall 2015 following Medflow's earlier ineffectual attempt to terminate him for Cause in May 2015. He premises his right to Severance Benefits and unpaid wages on his having Terminated for Good Reason. Medflow counters that Schiffli cannot rely on the "patently unreasonable termination provisions" in the employment agreement. As an example, Medflow argues that the definition of Cause in Schiffli's agreement should be stricken because it requires a final judicial determination of Schiffli's wrongdoing, which would "operate to prevent Medflow from firing Schiffli without continuing to pay him long after his termination and when he provides no services to Medflow." (Defs.' Resp. & Br. Opp'n Pl. Schiffli's Mot. Partial Summ. J. 7–8.) Medflow subsequently argues that, "[i]n the absence of those unconscionable 'cause' and 'good reason' provisions of the agreement, Medflow properly terminated Schiffli under the employment agreement on May 1, 2015." (Defs.' Resp. & Br. Opp'n Pl. Schiffli's Mot. Partial Summ. J. 10.)

159.   Schiffli's employment agreement defines "Termination for Cause" as follows:

> For purposes of this Agreement, discharge for cause shall be limited to discharge for (i) unauthorized conduct by Schiffli which has caused demonstrable and serious damage to Medflow, monetary or otherwise, as evidenced by a determination in a binding and final judgment, order or decree of a court or administrative agency of competent jurisdiction, in effect after exhaustion or lapse of all rights of appeal, in an action, suit or proceeding, whether civil, criminal, administrative or investigative; (ii) conviction of Schiffli of a felony, as evidenced by binding and final judgment, order or decree of a court of competent jurisdiction, in effect after exhaustion or lapse of all right of appeal; or (iii) unreasonable neglect or refusal by Schiffli to perform his duties or responsibilities (unless significantly changed without his consent), as evidenced by binding and final judgment, order or decree of a court of competent jurisdiction, in effect after exhaustion or lapse of all right of appeal. ("Cause").  Any termination for Cause shall be approved by a resolution duly adopted by a majority of the Board of Directors of Medflow (or any successor corporation) or Chief Executive Officer of Medflow then in office, and delivered to Schiffli specifying in detail the factual basis for such termination and citing the provision of this Agreement serving as the basis for such termination.

(Schiffli Agreement ¶ 7.)

160.   "Termination for Good Reason" is defined as follows:

> For purposes of this Agreement, Schiffli shall have a Good Reason for termination of employment in the event of (i) any breach of this Agreement by Medflow; (ii) the removal of Schiffli from or any failure to reelect Schiffli to any of the positions held on the date hereof or any other positions to which Schiffli shall thereafter be elected or assigned except in the event that such removal or failure to reelect relates to the termination by Medflow of Schiffli's employment for Cause; (iii) a good faith determination by Schiffli, which determination shall be conclusive and binding on Medflow, that there has been a significant adverse change, without Schiffli's written consent, in working conditions or status, including but not limited to (A) a significant change in the nature or scope of Schiffli's authority, powers, functions, duties or responsibilities; (B) a reduction in the level of support services, staff, secretarial and other assistance, office space and accoutrements available to a level below that which is reasonably necessary for the

performance of such duties; or (C) a requirement that Schiffli relocate outside the vicinity of Mecklenburg County, North Carolina ("Good Reason").

(Schiffli Agreement ¶ 8.)

161. Medflow has not contested that, on February 10, 2015, Plaintiffs were placed on "paid vacation" and told that their "only job responsibility . . . was to stay away from the Medflow office[,]" (V. 2nd Am. Compl. ¶¶ 408–11), and that, on February 12, 2015, Schiffli e-mailed Medflow notice that it was in breach of his employment agreement for failure to pay the Change-of-Control Payment provided by the agreement, (V. 2nd Am. Compl. ¶ 425). It is also uncontested that on May 1, 2015, Medflow advised Schiffli through the Cause Letter that he was being terminated for Cause, effective immediately. (V. 2nd Am. Compl. ¶¶ 429–30; Cause Letter 1.) The parties do not dispute that Schiffli did not receive any wages from Medflow after May 1, 2015. (V. 2nd Am. Compl. ¶ 474.)

162. The Cause Letter states that Medflow's investigation into Schiffli while he was on administrative leave with pay as of February 10, 2015 resulted in Medflow's conclusion that Schiffli "engaged in conduct and various transactions for [his] own benefit and at Medflow's expense in violation of [his] duties to Medflow," causing "severe loss in potential profits and revenues." (Cause Letter 1.) Specifically, Medflow purportedly found that Schiffli:

> mismanaged the company by falsifying documentation, misleading the company's vend[o]rs, failing to inform customers of material events (which ultimately led to customer confusion and loss of sales and profits), purposely stopping sales on the company's lucrative business products, failing to address and respond to customer and value partner inquiries, and mishandling client relationships.

(Cause Letter 1.)

163. As noted above, Medflow has not produced any documentation of the investigation it allegedly conducted or any other evidence in support of Schiffli's termination beyond the Cause Letter itself. Neither has Medflow made any argument justifying its failure to give adequate notice of termination under the terms of the agreement.

164. Schiffli, along with Ehmann and Throneburg, sent a letter to Medflow on September 3, 2015 stating that they were exercising their rights to terminate their employment agreements for Good Reason ("Good Reason Letter"). (V. 2nd Am. Compl. ¶ 458–59; V. 2nd Am. Compl. Ex. 36 ("Good Reason Letter"), ECF No. 118.29.)[16]

165. In the Good Reason Letter, Schiffli contends first that Medflow did not properly terminate Schiffli for Cause because it did not meet the requirement of providing a resolution adopted by Medflow's board of directors and did not provide thirty days' written notice before termination, (Good Reason Letter 1–2), and second, that he had Good Reason to terminate his employment agreement because Medflow breached his agreement by failing to pay him the Change-of-Control Payment due on January 16, 2015, his salary since May 1, 2015, and his Insurance Benefits since April 30, 2015, and because Medflow removed Schiffli from his position on February 10, 2015, thereby materially changing his responsibilities. (Good Reason Letter 3.)

---

[16] Schiffli later hand-delivered the Good Reason Letter to Medflow on September 14, 2015 following a dispute between the parties regarding whether proper notice had been given. (V. 2nd Am. Compl. ¶ 466.)

166. The record is clear that a change-of-control event occurred in 2015. (*See, e.g.*, V. 2nd Am. Compl. ¶¶ 21–22, 325.) The Court therefore concludes that Schiffli's right to a Change-of-Control Payment vested in January 2015 before Schiffli was terminated.

167. The Court further concludes that the record does not support that Medflow terminated Schiffli for Cause and that the Court need not consider whether Schiffli terminated for Good Reason. The record demonstrates that Medflow took action to terminate Schiffli and thus precluded Schiffli from later terminating for Good Reason when it permanently relieved him of his responsibilities as Medflow's CFO on May 1, 2015, asked him to return all Medflow property, and stopped making salary payments or providing other employment benefits after that date.

168. While Schiffli's right to Severance Benefits might have been lost had Medflow terminated Schiffli for Cause, Medflow has failed to forecast substantial evidence supporting termination for Cause even if the termination provisions it attacks are disregarded. The net effect is that Medflow terminated Schiffli without Cause on May 1, 205, Schiffli's right to Severance Benefits vested ninety days after that date, and Schiffli is entitled to wages through the expiration of the ninety-day contractual notice period.

169. Solely for purposes of illustration, the Court assumes without finding that the contractual definitions of termination for Cause and Good Reason may be stricken or disregarded upon some legal theory such as unconscionability. *See Rite Color Chem.*, 105 N.C. App. at 18, 411 S.E.2d at 648 ("[If] a contract . . . or any clause

of such contract was 'unconscionable' at the time it was made, the trial court 'may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.' " (citation omitted)).

170. When the Court disregards those provisions, it must still enforce the remainder of the agreement. Paragraph 6 provides that Medflow may terminate with or without Cause subject to paragraph 9, which entitles Schiffli to Severance Benefits if Medflow terminates without Cause. If the Court disregards the contractual definition of "Cause," it must separately determine the standard by which to judge Medflow's right to terminate Schiffli without paying him Severance Benefits. The Court then looks to the definition of "just cause" developed in North Carolina case law. *See* N.C.P.I.-Civil 640.14; *see also, e.g.*, *Wilson v. McClenny*, 262 N.C 121, 131, 136 S.E.2d 569, 577 (1964) (stating that an employer may terminate for just cause if he fails to serve his employer "with reasonable care, diligence, and attention"); *Haynes v. Winston-Salem Southbound Ry. Co.*, 252 N.C. 391, 398, 113 S.E.2d 906, 911 (1960) (holding that an employer may terminate for just cause if the employee fails to perform all the duties incident to his employment with ordinary diligence, care, and attention).

171. The Court concludes that Medflow has not forecasted sufficient evidence upon which a fact finder could find Medflow terminated Schiffli for Cause even under this more relaxed standard. The conclusory Cause Letter is the sole evidence with which Medflow has come forward in support of its position, and that letter, standing

alone, does not rise to the level of the substantial evidence necessary to create an issue of fact for trial.

172.    In short, Schiffli is entitled to summary judgment that Medflow did not terminate his agreement for Cause even if the Court does not enforce the contractual definition that Medflow attacks. The Court therefore further concludes that Schiffli was neither required to nor able to terminate his agreement for Good Reason because Medflow terminated the agreement without Cause effective ninety days after delivering the Cause Letter on May 1, 2005, vesting Schiffli with a right to unpaid wages to that date, and thereafter to Severance Benefits.

### e.    Schiffli's Contract Damages

173.    There are outstanding issues of material fact that must be resolved prior to entering a final judgment as to the amount of Schiffli's contract damages. While the Court has determined the effective date of termination, other issues must be resolved to determine the exact amount of unpaid wages to which Schiffli is entitled.[17] Additionally, the value of the Insurance Benefits to which Schiffli may be entitled are not sums certain which can determined on the present record, and Medflow contends their determination will likely require expert testimony. The Court also defers determination of whether Schiffli is entitled to statutory penalties and the amount of attorneys' fees to which Schiffli is entitled.

---

[17] The Court concludes that the record is inadequate to determine that value of Schiffli's unpaid wages for the ninety days after he was terminated because there is no evidence in the current record of where May 1, 2015 fell in Medflow's pay cycle, and the parties have not themselves calculated the value of unpaid wages if Schiffli was terminated without Cause. It is therefore unclear whether the parties dispute this amount.

174. The Court finds that other portions of Schiffli's monetary recovery are capable of exact determination without the need for further proceedings. Specifically, the Change-of-Control Payment and the Severance Payment equal to a one-time payment of Schiffli's annual base salary plus interest can be calculated based on the current record.

175. Medflow contends that the amount of the Change-of-Control Payment pursuant to paragraph 17 of Schiffli's employment agreement depends on an unresolved material issue of fact and "requires a sophisticated tax analysis." Seeking to bolster its argument, Medflow notes that Schiffli's expert, Walker, calculated the Change-of-Control Payment as $289,830, whereas Schiffli earlier calculated the payment as $236,070.45. (Def.'s Resp. Opp'n Schiffli's Mot. Summ. J. 15; *see* Exs. Def.'s Resp. Opp'n Schiffli's Mot. Summ. J. Ex. 3 ("Schiffli Change-of-Control Calculation"), ECF No. 352.1; V. 2nd Am. Compl. Ex. 22, ECF No. 118.28.) The Court finds Medflow's contention without merit.

176. The plain language of the employment agreement provides the basis for determining the amount of the Change-of-Control Payment without the need for any further evidentiary proceeding. *See Hodgin v. Brighton*, 196 N.C. App. 126, 128, 674 S.E.2d 444, 446 (2009) ("Where the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court . . . must construe the contract as written, in the light of the undisputed evidence as to the custom, usage, and meaning of its terms." (citation omitted)).

177. Paragraph 17 of Schiffli's employment agreement provides:

Upon the occurrence of a Change of Control of Medflow, Medflow shall pay to Schiffli or his designated beneficiary an amount equal to one (1) times his Annual Base Salary as provided by paragraph 10 *supra* due and payable upon the effective date of the Change of Control Payment ("Change of Control Payment"). . . . At the time of the Change of Control Payment, Medflow shall pay to Schiffli an additional amount (the "Gross-Up Payment") such that the net amount retained by Schiffli after deduction of any federal, state, or local income tax on the Gross-Up Payment and Change of Control Payment shall equal the pre-tax amount of the Change of Control Payment. For purposes of determining the amount of the Gross-up Payment, Schiffli shall be deemed to pay federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made (determined without regard to any additional tax imposed for the purpose of phasing out the benefits of lower rates of taxation and deductions of personal exemptions) and state and local income taxes at the highest marginal rates of taxation in the state and locality of his residence on the date the Gross-Up Payment is made, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

(Schiffli Agreement ¶ 17.)

178. The agreement therefore states that the Change-of-Control Payment should be equal to Schiffli's annual base salary, $165,000, after federal and state taxes are taken into account. The Gross-Up Payment, the amount by which Schiffli's annual base salary should be increased such that Schiffli takes home $165,000 after taxes, is determined under the simple formula in paragraph 17, which, contrary to Medflow's concerns, avoids any complex accounting by disregarding progressive tax rates and the effect of any itemized deductions except the state and local tax or "SALT" deduction. *See* 26 U.S.C. § 164(a). The formula assumes that the first dollar of the Change-of-Control Payment is taxed at the highest marginal tax bracket for the year in which the change-of-control event occurs for both state and federal taxes

and offsets the resulting federal tax liability dollar-for-dollar by the resulting state tax liability.

179. The record is clear that a change-of-control event occurred during the 2015 tax year. (*See, e.g.*, V. 2nd Am. Compl. ¶ 325.) The Court takes judicial notice that the highest federal marginal tax rate in 2015 was 39.6%, and the highest North Carolina marginal tax rate in 2015 was 5.75%. *See* https://www.irs.gov/pub/irs-prior/i1040tt--2015.pdf, at 89, last visited Apr. 7, 2020; https://www.ncdor.gov/taxes/individual-income-tax/tax-rate-schedules/tax-rate-tax-year-2015-and-2016, last visited Apr. 7, 2020.

180. Accordingly, Schiffli's state tax liability for the purpose of the Change-of-Control Payment is $165,000 multiplied by 5.75%, which equals $9,487.50. As to federal liability, considering the SALT deduction, Schiffli will be taxed on his $165,000 annual base salary less his state tax liability ($9,487.50), which equals $155,512.50. $155,512.50 multiplied by the federal rate of 39.6% equals $61,582.95. Therefore, Schiffli will have a North Carolina state tax liability of $9,487.50, and a federal tax liability of $61,582.95, which together equal a Gross-Up Payment of $71,070.45. The Change of Control payment, $165,000, plus the Gross-Up Payment, $71,070.45, equal a total payment to Schiffli of $236,070.45 before interest is calculated under paragraph 23 of Schiffli's employment agreement. This is the amount Schiffli demanded from Medflow in February 2015. (*See* Schiffli Change-of-Control Calculation; *see also* V. 2nd Am. Compl. ¶ 606(a).)

181. The Court therefore concludes that Schiffli is entitled summary judgment that his recovery shall include a $165,000 Severance Payment under paragraph 9(a)(i) and a $236,070.45 Change-of-Control Payment under paragraphs 1 and 17 of his agreement, plus interest at the contractual rate. Unless otherwise agreed by the parties, further proceedings are required to determine the amount Schiffli is entitled to recover for unpaid wages after May 1, 2015, thirty-six months of Insurance Benefits, statutory penalties, and attorneys' fees, together with interest as may be provided.[18]

182. The Court is therefore unable to enter a final judgment pending resolution of these remaining issues.

## VI.    CONCLUSION

183. Consistent with the foregoing:

   a.    Medflow's Motion for JNOV as to Schiffli is DENIED;

   b.    Medflow's Motion for New Trial as to Schiffli is DENIED;

   c.    Schiffli's Motion for Entry of Judgment on the jury verdict is GRANTED, and the Court hereby ADJUDGES AND DECREES that a jury has finally and conclusively determined that Schiffli

---

[18] Recognizing that further proceedings are required before entering a final monetary judgment, the Court concludes that that Schiffli's unpaid wages, the Severance Payment, the Change-of-Control Payment, and the value of the Insurance Benefits, if calculable, *see Morris*, 368 N.C. at 862–63, 788 S.E.2d at 158–59, are wages for the purposes of the Wage and Hour Act, N.C.G.S. § 95-25.2(16) (" 'Wage' paid to an employee means compensation for labor or services rendered by an employee . . . [including] severance pay . . . and other amounts promised[.]"); *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 324, 660 S.E.2d 577, 584 (2008) (stating severance benefits were wages under the Wage and Hour Act because they "constitute severance pay").

was not an officer of Medflow at the time he entered his employment agreement, either *de jure* or *de facto*;

d. The Court further determines that, as a result of the jury's verdict, Schiffli is not required to prove that his agreement was fair to Medflow at the time it was entered;

e. Schiffli's Motion for Summary Judgment is GRANTED as to Defendants' affirmative defenses or counterclaims for breach of fiduciary duty and constructive fraud to the extent they impact Schiffli's breach of contract claim, and those defenses and counterclaims are hereby DISMISSED WITH PREJUDICE;

f. Schiffli's Motion for Partial Summary Judgment on the basis that Medflow did not terminate his employment agreement for Cause is GRANTED;

g. The Court determines that Medflow terminated Schiffli's employment agreement without Cause effective on the date ninety days after May 1, 2015;

h. Schiffli is entitled to summary judgment that he is entitled to recover unpaid wages from May 1, 2015 to the effective date of termination ninety-days later, Severance Benefits including the Severance Payment for $165,000 plus interest, and a Change-of-Control Payment in the amount of $236,070.45 plus interest;

i.  Further proceedings are required to determine additional sums to which Schiffli is entitled to recover, including: (1) the exact amount of unpaid wages from May 1, 2015 to the effective date of his termination, (2) the value of thirty-six months of Insurance Benefits, (3) any potential statutory penalties, (4) and attorney's fees;

j.  The Court hereby severs for separate trial the sole issue of the final amount Schiffli is entitled to recover from Medflow or Holdings in contract damages;

k.  Nothing in this Judgment, Order and Opinion should be construed as granting Schiffli a right to recover from or take action against any Defendant other than Medflow and Holdings;

l.  The Cross-Motions for JNOV as to Ehmann and Throneburg are DENIED;

m.  Medflow's Motion for New Trial as to Ehmann and Throneburg is GRANTED;

n.  Further progress in the case is subject to orders issued by the Chief Justice of the Supreme Court of North Carolina in response to COVID-19;

o.  To the extent that a right to appeal is not otherwise created by statute, the Court finds that this Judgment, Order and Opinion is interlocutory and there is just reason to delay appeal of any

issues decided here until their final adjudication and the entry of final judgment as to one or more of the Plaintiffs.

**SO ORDERED**, this the 9th day of April, 2020.


/s/ James L. Gale
_____
James L. Gale
Senior Business Court Judge